

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,275

### FABIAN HERNANDEZ, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 20060D05825
### IN THE 346TH DISTRICT COURT
### EL PASO COUNTY

**MEYERS, J., delivered the opinion of the Court with respect to points of error one through eleven, in which PRICE, JOHNSON, KEASLER, HERVEY, COCHRAN, and ALCALA, JJ., joined and an opinion as to point of error twelve, in which PRICE, KEASLER, and HERVEY, JJ., joined. KELLER, P.J., filed a concurring opinion in which JOHNSON, COCHRAN and ALCALA, JJ., joined. WOMACK, J., concurred.**

## O P I N I O N

In November 2009, a jury convicted appellant of the 2006 capital murder of Renee

Urbina Hernandez and Arturo Fonseca. TEX. PENAL CODE ANN. § 19.03(a)(7). Based on

the jury's answers to the special issues set forth in Texas Code of Criminal Procedure

Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death.  Art. 37.071, § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).  After reviewing appellant's twelve points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

BACKGROUND

Appellant and Renee Urbina Hernandez ("Hernandez") were married with two children.  They both drank heavily, and their marriage was tumultuous.  The couple separated and reunited several times.  In April 2006, they appeared to permanently separate.  Hernandez and the children moved in with her mother.  Hernandez worked at McDonald's with Arturo Fonseca, a friend with whom she would go out partying.

On the night of November 2, 2006, appellant met his long-time friend Diesta Torres at a local bar.  Appellant told Torres that he had "messed up" with Hernandez and the children and that he missed them.  According to Torres, appellant was not acting normally, and he appeared to be drunk.  At around 10:30 p.m., Torres agreed to drive appellant to a nearby motel, but he asked to be dropped off before arriving there.  Torres let appellant out a short distance from Pyrite Street, approximately a four-minute walk from Hernandez's mother's house.

At around 2:30 a.m. on November 3, 2006, Hernandez's sister, Cynthia Estevez, heard arguing outside their mother's home followed by three gunshots.  Estevez saw a

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

white two-door car drive away slowly. Outside, she found a male body, later identified as that of Fonseca, lying between two family vehicles, and she went back inside to call 9-1-1. Meanwhile, their mother found Hernandez's body lying nearby. A neighbor, who also heard the gunshots, saw a white two-door Honda driving away. She also called 9-1-1.

Appellant appeared at the home of his friend Sergio Carrasco around 4:00 a.m. asking for a place to stay. Appellant borrowed some "blankets and covers" and, later, Carrasco's car, returning it before Carrasco needed to leave for work that morning. Appellant's girlfriend picked him up and took him to his father's house. When Carrasco returned home for his lunch, he noticed a car with blankets on it parked behind his house.

Police found a white two-door Honda, subsequently identified as belonging to Fonseca, hidden behind Carrasco's home. Investigators processed the Honda for evidence and found, on an envelope, a latent fingerprint that was later determined to match appellant's left thumb. Police also searched appellant's father's home, where they collected a .380 semi-automatic handgun and five bullets. Testing showed that the handgun and bullets matched the three shell casings found at the crime scene.

Autopsies of Hernandez and Fonseca revealed that the two died from gunshot wounds to their heads. Hernandez's wound was located on her left forehead, and Fonseca's was at the back of his head. Evidence indicated that the gun barrel was approximately 10-12 inches away when each was shot. At the times of their deaths, both had alcohol, but no illegal drugs, in their systems.

JURY SELECTION

In points of error one and two, appellant complains that the trial court erred when it prevented him from questioning prospective jurors about whether they could consider specific kinds of mitigating evidence in reaching a decision on the mitigation special issue. Appellant asserts that in doing so, the trial court prevented him from effectively exercising both challenges for cause and peremptory challenges.

During the voir dire of prospective juror Jeanine Peterson, defense counsel asked Peterson, in light of her questionnaire answer:

> So if you do not agree that a person who has been abused as a child is less responsible for his or her actions, okay, you cannot take that, if you hear it – if you were to hear it, you cannot take that into consideration to determine whether it reduces the person's moral culpability, right?

The State objected to the question as "contracting." Ultimately, the trial court sustained the objection, and defense counsel informed the trial court that he intended to ask each prospective juror similar questions based on questionnaire responses. The record reflects that defense counsel attempted to ask similar questions of another juror with the same results. Later, defense counsel submitted to the trial court the questions that he would have asked each juror:

> Would you refuse to consider evidence of turbulent family history[, emotional problems, defendant's upbringing, defendant's good character, mental impairment, a drug problem, child abuse, psychiatric problems, dysfunctional family history, or alcohol abuse] to determine whether that evidence is a circumstance that would warrant a sentence of life without parole rather than a death penalty?

These questions loosely corresponded with jury questionnaire questions that asked whether the prospective juror agreed or disagreed that the following factors rendered a person less responsible for his actions:  being abused as a child, suffering from emotional or psychiatric problems or a disadvantaged background, being mentally handicapped, and abusing drugs or alcohol.

The record reflects that during individual voir dire, defense counsel asked prospective jurors to explain or expand on their answers to the written questions.  Defense counsel was allowed to explore whether the prospective jurors did, in fact, consider these specific factors to be mitigating.  However, when defense counsel attempted to ask Peterson the question quoted above, the trial court sustained the State's objection.  The trial court also granted a running objection.

We review a trial court's ruling regarding the limitation of voir dire questioning for an abuse of discretion.  *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  In this review, our focus is whether appellant proffered a proper question regarding a proper area of inquiry.  *Id*.  A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions.  *Id*. at 38-39.  Where the trial court does not place an absolute limitation on the substance of an appellant's voir dire question, but merely limits a question due to its form, the appellant must attempt to rephrase the question or risk waiver of the alleged voir dire restriction.  *Howard v. State*, 941 S.W.2d 102, 108-11 (Tex. Crim. App. 1996).

A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). Often a commitment question requires a "yes" or "no" answer, and the answer commits a juror to resolve an issue in a particular way. *Id*. Not all such questions are improper, however. *Id*. at 181. Where the law requires a certain type of commitment from jurors, such as considering the full range of punishment, an attorney may ask prospective jurors to commit to following the law in that regard. *Id*.

The law does not require that a juror consider any particular piece of evidence to be mitigating. *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998). The law requires only that defendants be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating. *Id*. Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry. *Standefer*, 59 S.W.3d at 181.

The question at issue here was an improper commitment question; it sought a "yes" or "no" answer and committed the prospective juror to a determination of whether the stated circumstance was mitigating, *i.e.* being abused as a child. Further, the record reflects that the trial court did not place an absolute limitation on the underlying substance of the excluded question. Appellant was allowed to ask prospective jurors to expound on their questionnaire answers and was therefore able to delve into that substance. Rather,

the trial court merely sustained the State's objection to the form of the question. *See Howard*, 941 S.W.2d at 108-12 (finding that where appellant was allowed to question jurors regarding the substance of the restricted questions, albeit in a different form, there was no abuse of discretion). We do not find an abuse of discretion. Points of error one and two are overruled.

In points of error three through eight, appellant complains about the trial court's refusal to grant challenges for cause against several prospective jurors. Before harm can be shown on the record with respect to a trial court's denial of a challenge for cause, a defendant must: (1) use a peremptory strike on the complained-of venire member; (2) exhaust his peremptory strikes; and (3) request an additional peremptory strike to use upon a specifically identified objectionable venire member who, because the extra strike is denied, actually sits on the jury. *See Busby v. State*, 253 S.W.3d 661, 670 (Tex. Crim. App. 2008).

The record shows that, by the parties' agreement following the individual voir dire of each prospective juror, the trial court gave first the State and then appellant the opportunity to challenge the prospective juror for cause. If the prospective juror was not successfully challenged for cause by either party, that prospective juror became a member of the pool of qualified jurors.[2] When the pool contained a sufficient number of qualified jurors, the trial court passed each qualified juror, in the order of qualification, to the State

---

[2] The record reflects that each time the trial court denied appellant's challenge for cause, appellant requested an additional peremptory challenge, although he had not yet used any.

and then to appellant for peremptory challenge. If neither party used a peremptory challenge against the qualified juror, that person became a juror in this case.

At the conclusion of individual voir dire, but before either side had exercised any peremptory challenges, appellant filed a motion requesting additional peremptory challenges. In a death-penalty case with only one defendant, a defendant is entitled to fifteen peremptory challenges. Art. 35.15(a). Appellant identified fourteen prospective jurors that he had unsuccessfully attempted to challenge for cause. He argued that because his challenges for cause had been denied with respect to each of the fourteen identified prospective jurors, he would be forced to use a peremptory challenge against each of them and that he had already, "in effect, exhausted his peremptory challenges."

The trial court denied appellant's request for additional peremptory challenges, and the process of jury selection continued. The record reveals that appellant did not use a peremptory challenge against one of the fourteen prospective jurors he identified in his motion. That prospective juror, Roxanne Marie Flores, ultimately sat as the fourth juror in the case. Appellant used peremptory challenges against the other thirteen prospective jurors identified in his motion, as well as two other jurors who were not identified in his motion.

Although appellant used all of his peremptory challenges, and renewed his request for additional peremptory strikes following the use of his fifteenth strike, the record reflects that appellant did not identify to the trial court an objectionable juror who sat on

the jury against whom he would have used an additional peremptory challenge. Further, appellant does not identify such a juror in his brief. Therefore, appellant does not show that he suffered harm with regard to these complaints. Points of error three through eight are overruled.

In points of error nine and ten, appellant claims that the trial court erred in granting the State's challenges for cause against two prospective jurors in violation of *Wainwright v. Witt,* 469 U.S. 412 (1985), and *Adams v. Texas*, 448 U.S. 38 (1980). A prospective juror who can set aside his beliefs against capital punishment and honestly answer the special issues is not challengeable for cause. *See Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1980). However, under *Witherspoon* and its progeny, a trial court may grant a State's challenge for cause on the basis of a prospective juror's conscientious scruples about the death penalty if the prospective juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 433; *Smith v. State*, 297 S.W.3d 260, 268 (2009).

We review a trial court's ruling on such a matter with "considerable deference" because the trial court is in the best position to evaluate a prospective juror's demeanor and responses. *Smith*, 297 S.W.3d at 268. When a prospective juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id*. We will reverse a trial court's ruling only if the record shows a clear abuse of discretion. *Id*.

Appellant complains in point of error nine that the trial court erroneously granted the State's challenge for cause against prospective juror Guadalupe Romero Quinonez. Appellant argues that Quinonez's answers during voir dire "demonstrated that her reservation about the death penalty would not prevent or impair her ability to answer the special issues."

Following the prosecutor's explanation of the punishment special issues, Quinonez stated that, because of her religion, she would have "a problem judging somebody." She then stated that, while she was not necessarily opposed to the death penalty, she could not honestly consider the two special issues and answer them in such a way as to impose a sentence of death:

> [State]: If you know you can't do that, you've got to tell us, for whatever reason, if it's religion, if the idea is too much, if it's knowing that that's a decision you would have to live with for the rest of your life. But you've got to tell us now, because we're entitled to a jury that can honestly say, "I could do this. I could consider it, and if I answered those questions correctly, I could sentence someone to death." Can – can you do that?
>
> [Quinonez]: No.
>
> [State]: Okay. And is it your religious belief? Is it all of it, capital –
>
> [Quinonez]: All of it.

Quinonez reaffirmed that, even if the evidence warranted the death penalty, she could not answer the special issues in such a way as to impose the death penalty.

Following defense counsel's further explanation of the requirements for capital

murder, the punishment process, and the special issues, Quinonez stated that the death

penalty was justified in certain cases, such as killing a child under six, a serial killing, or a

"heinous" crime "where they cut up bodies." Quinonez admitted that she did not know if

the capital murder in this case was brutal. She stated to defense counsel that she could

answer the future-dangerousness special issue affirmatively if the evidence showed that

the defendant was extremely violent and would continue to be so.

During further questioning by the prosecutor, Quinonez asserted that she could

consider the death penalty for certain crimes and under certain facts. When reminded that

this case involved the murder of two people, not the murder of a child under six,

Quinonez indicated that she could not consider the death penalty, stating: "No. If it

comes down to that, just to be very honest, no." Quinonez further stated that her religious

beliefs regarding judging others would impair her ability to be a juror:

> [State]: Okay. And this – this is not wanting to judge or feeling like you may not be able to judge and for your religious purposes, that would impair your ability, as a juror – as far as the law that's given to you, it would impair your ability to be a juror, when the law says that you have to consider death as a possibility, as a possible punishment; is that correct?

> [Quinonez]: Yes.

Upon further examination by defense counsel, Quinonez stated that in a case

involving the murder of two people, she could not keep an open mind or consider the

death penalty based on the special issues. However, she later stated that she could answer the special issues based on the evidence:

> [Defense]: And I'm following up. In that situation, given your views and the way you answered [the questionnaire], that there are times when you thought it would be necessary, can you still keep an open mind, that there could be a situation where it would be necessary for the death penalty to be imposed, based on these two questions?
>
> [Quinonez]: I had said to [the prosecutor], and I will say the same to you. No.
>
> [Defense]: Okay. Would you be able to answer those questions?
>
> [Quinonez]: Yes, based on the evidence.

Ultimately, the State challenged Quinonez for cause, arguing that given the totality of her answers, her ability to fairly consider the death penalty would be impaired by "her own personal fears of judging someone" and by her feelings regarding the death penalty. The trial court granted the State's challenge for cause.

The record shows that Quinonez stated at least twice that she would not be able to answer the special issues in such a way that the death penalty would be imposed. The record also shows that she stated that she could answer the special issues based on the evidence. The totality of her voir dire demonstrates that she was a vacillating or equivocating juror. Her answers as to whether she could honestly answer the special issues changed depending on which party questioned her. Additionally her statements regarding her personal beliefs against judging another, as well as her personal limitations

on the types of cases in which she would consider the death penalty, support the trial court's determination.

The trial court was in the best position to evaluate Quinonez's demeanor and responses in determining whether her views would substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. Based on the totality of the voir dire testimony, the trial court did not abuse its discretion in granting the State's challenge for cause. Point of error nine is overruled.

In his tenth point of error, appellant complains that the trial court granted the State's challenge for cause against prospective juror Julieta Chavira.[3] Appellant argues that Chavira's answers during voir dire demonstrated that her reservations regarding the death penalty would not prevent or impair her ability to answer the special issues based on the evidence.

When asked by the prosecutor whether she could think of a case, set of facts, or evidence that would warrant her answering the special issues in a way that resulted in a death sentence, Chavira responded that she could not: "Since you put it that way, I – no. No. I guess not. Who am I?" When the prosecutor explained that ultimately the parties wanted to know whether she could answer the special issues in a way that would impose the death penalty, and specifically whether she could keep an open mind and consider imposing the death penalty, Chavira stated that she could not.

---

[3] This prospective juror is referred to as both Julieta Chavira and Julieta Chaviera in the reporter's record.

The prosecutor then explained to Chavira the requirements for proving capital murder, the procedure during the punishment stage of trial, and the special issues. When the prosecutor asked Chavira whether she could honestly answer the mitigation special issue in such a way that would result in the death penalty, Chavira answered that it would be hard, she did not know if she could answer the question so that the death penalty would result, but she did not think she could do it. When further asked whether she could honestly answer the mitigation special issue, Chavira stated that she would not know until she heard the evidence and that she could answer the issue honestly.

The prosecutor then asked Chavira about her questionnaire answers, which seemed to conflict with her answers during voir dire. Chavira stated that she did not think that she could be a juror in the case because it would be too hard for her:

[Chavira]: I don't want to do this. I'm being honest right now. I don't want to do this. I'm uncomfortable. I don't like it and, honestly, I don't want to do it.

[State]: Okay.

[Chavira]: That's how I feel.

[State]: But my last question for you – and then the defense will be able to ask you questions as well, because I have to be able to know that somebody would truly consider the death penalty as an option and not just lip service, but truly consider it. That's why I ask you the question I do, which is, would you always answer yes to [special issue] 2 irregardless (sic) of the evidence so that a person would receive life instead of death?

[Chavira]: I had already answered you, but you are pushing me.

[State]:  And your answer is no?  What is your answer?

[Chavira]:  This is uncomfortable, and I don't want to be here.  I'm sorry.

[State]:  That's okay.  I understand.

[Chavira]:  If it is the way it is here right now, I can imagine then, it's going to be tougher or harder.

At this point during Chavira's voir dire, the trial court ordered a break.  The record reflects that the trial court expressed concern about Chavira's fitness and ability to sit as a juror in a capital case and asked if the parties would agree to excuse her.  The defense did not agree, and when voir dire resumed, Chavira again stated that she did not want to be a juror, she did not want the responsibility of making the decision of whether to impose the death penalty, she did not think she could do it, and regardless of the evidence, she did not want to be responsible for answering the special issues in a way that would cause the death penalty to be imposed.

Defense counsel acknowledged Chavira's reluctance regarding the death penalty, but elicited testimony from her that she believed it was necessary in some cases.  Upon further questioning by the defense, Chavira stated that she could not answer the special issues without first hearing the evidence.  When counsel asked Chavira about her views regarding the death penalty in a case involving the murder of two people, Chavira responded that she would try to be honest in answering the special issues based on the evidence.  When specifically asked by defense counsel if she could answer the special

issues based on the evidence, Chavira stated that she hoped that she would be able to do

so, but that it would be difficult and she did not know if she could:

[Defense]: So the point is, can you answer those questions based on whatever evidence is presented to you?

[Chavira]: I would hope to. I would hope to. And I know you don't want to hear that. It's yes or no.

[Defense]: And I appreciate – you should be struggling with it. It should be hard. But before we go on, or before it's too late, I mean, that is – that is the question. Can you answer these [special issues]?

[Chavira]: It's hard. I'm going to tell you right now. I can't – I don't know. I don't know.

[Defense]: Are you going to automatic –

[Chavira]: I don't want to waste your guy's time anymore. I'm sorry. Honestly I am.

[Defense]: But if you are selected as a juror –

[Chavira]: Why would you want somebody that can't decide?

[Defense]: That's what we are trying to figure out. I mean, will you answer the [special issues] on the evidence, or are you going to answer the [special issues] just to go home?

[Chavira]: On the evidence. On the evidence.

[Defense]: Okay.

[Chavira]: I have already told you guys, but I don't know what else you guys want from me. I don't know.

[Defense]: Okay. And if somehow you did end up on this jury, and I understand your frustration, but if you were to end up on the jury, I'm sure you would be able to put aside your frustration.

[Chavira]:     I would have to. And it's not that I just want to go home. I want to be fair. That's all I can tell you.

The prosecutor then asked Chavira if her reluctance to participate in a capital case would impair her ability to answer the special issues. Chavira initially responded that she could not answer that question, but she then stated that it would not impair her ability. When further asked whether she would be a good juror in this case, Chavira stated that she would be honest and "see what happens, see the circumstances, see everything." She again brought up her concern about imposing the death penalty, stating that she is "not God," that she is not here to judge anyone, and that it would be difficult for her to take a life, even in a legal setting. However, she also stated that if the evidence was there, she could impose the death penalty.

The trial court directly questioned Chavira regarding exactly what she meant when she said that she did not want to be there. Chavira told the trial court that she gets nervous, there was too much pressure on her, the pressure was affecting her health negatively, and she was not feeling well and was jittery. The trial court questioned how the pressure would affect her if she were selected as a juror, given that it was getting to her even before the trial started. Chavira responded that she was just uncomfortable.

The State challenged Chavira for cause, arguing that Chavira's obvious reluctance to participate and her opposition to the death penalty would impair her ability to answer the special issues. The trial court granted the challenge for cause, stating:

I'm going to look at the totality of the voir dire; and I'm going to agree with the State that she should be challenged for cause. I think she was hoping in good faith and with an open heart to try to do this, but when pressed she said she couldn't do it.

When making its ruling, the trial court noted that Chavira's response of "Why are you asking me these questions if I already told you I can't do it? Why are you wasting your time?" stood out in his mind.

Depending on which party questioned her, Chavira responded alternately that she could not honestly answer the special issues so that the death penalty would result or that she could answer the special issues based on the evidence. Further, Chavira stated that she could not judge another person and was uncertain about her ability to follow the law. Additionally, she indicated that she was uncomfortable with the decisions that had to be made in a capital case, that she did not want the responsibility of making those decisions, and that she did not think she could do it.

The trial court was in the best position to evaluate Chavira's demeanor and responses in determining whether her views would substantially impair her ability to perform her duties as a juror in accordance with the trial court's instructions and her oath. Considering the totality of the voir dire testimony, we determine that the trial court did not abuse its discretion in granting the State's challenge for cause. Point of error ten is overruled.

PSYCHIATRIC INTERVIEW

In point of error eleven, appellant alleges that the trial court erred when it ordered appellant to be examined by the State's mental-health expert. Specifically, appellant complains that the trial court refused to limit the State's expert's examination to the same matters covered by his own expert. Relying on *Smith v. Estelle,* 451 U.S. 454 (1981), *Soria v. State,* 933 S.W.2d 46 (Tex. Crim. App. 1996), and *LaGrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997), appellant argues that the trial court's refusal to limit the State's expert's examination resulted in him not being able to present a defense during the punishment phase and also deprived him of his Fifth Amendment right against self-incrimination.

During a pretrial status conference, the prosecutor informed appellant and the trial court that, because appellant had been examined by a defense mental-health expert, the State would be filing a motion requesting that the State's mental-health expert also be allowed to examine appellant. When a defendant intends to present mental-health expert testimony, the State is entitled to compel the defendant to undergo examination by the State's expert for rebuttal purposes ("*LaGrone* examination"). *LaGrone*, 942 S.W.2d at 609-12. Appellant requested that the trial court prohibit the examination or limit the scope of the State's expert's examination to the same testing and examination conducted by defense expert, Dr. Luiz Natalicio. Dr. Natalicio testified that he had assessed appellant for intellect and school achievement and had evaluated appellant to ascertain

whether appellant could have understood the consequences of waiving his rights and giving a statement to police. On cross-examination, Dr. Natalicio admitted that, in addition to a variety of materials, he relied on interviews with appellant in forming his opinion. Dr. Natalicio's interviews with appellant covered many topics, including appellant's emotions, prior imprisonment in another state for manslaughter, the circumstances surrounding the prior offense, and his guilty plea to the prior offense.

When the trial court refused to prohibit or limit the State's expert's examination, appellant filed written notice that he refused to submit to an examination by the State's mental-health expert. The record reflects that defense counsel acknowledged that appellant's refusal to submit to the *LaGrone* examination would result in the defense expert not being allowed to testify about his evaluation of appellant.

We have previously addressed the issue of a defendant refusing to submit to a *LaGrone* examination because the testimony of the State's expert could be used against him. *See Saldano v. State*, 232 S.W.3d 77, 85 (Tex. Crim. App. 2007). In that case, unlike here, Saldano did not file timely notice to the trial court of his contention that the trial court's refusal to limit the State's expert examination prevented him from presenting mitigating evidence during punishment in violation of his constitutional rights. *Id*. at 88. Despite this lack of preservation, we noted that Saldano's claim would fail on the merits because it would not be entitled to review. *Id*.

In *Saldano*, we noted that the United States Supreme Court stated, in an analogous case, that an *in limine* ruling regarding impeachment could not be reviewed unless the witness actually testified. *Id*. at 88-89 (citing *Luce v. United States*, 469 U.S. 38 (1984)). Likewise, we determined that Saldano was prevented from presenting his complaint for appellate review because he had not submitted to a *LaGrone* examination. *Id*. at 90. We stated that we would not speculate as to the harm the State's expert's testimony might have imposed on Saldano had the expert examined Saldano and testified to the results. *Id*.

Similarly in this case, appellate review of the trial court's ruling is difficult outside a factual context and renders any attempt to apply a harm analysis "wholly speculative." *See id*. As we stated in *Saldano*, "it is practically impossible to 'compare the actual trial with the one that would have occurred' had [the expert] testified and appellant submitted to a *LaGrone* examination." *Id*.

To be entitled to appellate review of the trial court's ruling that a *LaGrone* examination would not be limited to the same areas examined by the defense expert, appellant was required to submit to the *LaGrone* examination and suffer any actual use by the State of the results of this examination. Point of error eleven is overruled.

## ADMISSIBILITY OF VICTIM CHARACTER TESTIMONY

In point of error twelve, appellant complains that the trial court erred when it excluded testimony about the victim's illegal drug use and promiscuous, extra-marital

sexual behavior. Appellant argues that the testimony was relevant to determining both the circumstances of the offense and appellant's personal moral culpability. Specifically, he asserts that Hernandez's illegal drug use and propensity to ask other men to engage in "three-way" and other extra-marital sex was relevant to the disintegration of their marriage as well as to the circumstances of the offense. Therefore, he argues that this was mitigating evidence that should have been presented to the jury.

Prior to appellant's presentation of evidence during the punishment phase, the trial court addressed the admissibility of Hernandez's drug use outside the presence of the jury. Appellant argued that the evidence was admissible to show appellant's relationship with Hernandez and as relevant mitigation evidence regarding the circumstances of the offense. The State countered that the evidence was not relevant mitigation evidence, was offered solely to "bash the victim," and was unfairly prejudicial. The trial court delayed its ruling, agreeing to take up the matter during the presentation of evidence.

Appellant then presented his punishment-phase evidence, including the mitigation evidence regarding appellant's background, the adverse developmental factors affecting his decision-making, and the volatile nature of his relationship with Hernandez. Specifically, the jury heard testimony that Hernandez insulted, embarrassed, and humiliated appellant in front of his family, ridiculed him, and physically assaulted him in front of his family and children. Appellant also presented testimony that Hernandez

regularly drank to the point of intoxication, and that when she did so, she "would be all over the guys."

During appellant's friends' and family members' testimony, defense counsel informed the trial court, out of the jury's presence, that the defense intended to present evidence of Hernandez's drug use and extra-marital sexual behavior to show appellant's background, provide an example of the destruction of the marriage, and develop mitigation as part of the circumstances of the offense. Appellant intended to present testimony from several witnesses that Hernandez regularly used marijuana and cocaine, her cocaine use caused emotional and financial strain on the marriage, she solicited and engaged men in three-way and other sex with appellant, and appellant was a "reluctant" participant in the sexual activity. The trial court did not allow the testimony, finding it to be unfairly prejudicial under Texas Rule of Evidence 403. The trial court also admonished appellant's expert, Dr. Mark Cunningham, not to discuss any negative character information regarding Hernandez. Dr. Cunningham, in an offer of proof, testified that he had considered Hernandez's drug use and sexual behavior in reaching his conclusions regarding the marital breakup and its effect on appellant at the time of the offense.

Article 37.071 section 2(a)(1) provides that, during a capital trial, evidence may be presented "as to any matter that the [trial] court deems relevant to sentence," including that relevant to mitigation. In addition, Texas Rule of Evidence 403 allows for the

exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. This rule carries a presumption that relevant evidence will be more probative than prejudicial. *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). "'Probative value' refers to the inherent probative force of an item of evidence–that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation–coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "Unfair prejudice" refers to the tendency to suggest that decisions may be made on an improper basis, commonly an emotional one. *Id*. All evidence is prejudicial to one party or the other–it is only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable. *See Davis*, 329 S.W.3d at 806. We review a trial court's decision to disallow evidence for an abuse of discretion, and in doing so, we reverse a decision only when it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001).

Mitigating evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). The trial court should admit evidence that a juror could reasonably find warrants a sentence less than death and must allow for consideration of the mitigating evidence. *Id.* "Victim character and victim impact evidence, both good and bad, are admissible

during the punishment phase if the factfinder may rationally attribute the evidence to the accused's 'personal responsibility and moral culpability.'" *Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009). However, a trial court should usually exclude evidence that draws a comparison between the victim and other society members based on morality or the victim's worth. *Id*.

With regard to the instant case, evidence of the unstable relationship and the emotional stress it caused appellant sheds light on the circumstances surrounding the offense and thus his moral culpability. The testimony about Hernandez's drug use and sexual promiscuity arguably meets the low threshold for relevance described in *Tennard*. However, we must still determine whether the probative value of this evidence was substantially outweighed by the danger of unfair prejudice.

We now turn to the Rule 403 analysis, which includes, but is not limited to the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1990). Appellant argues that the evidence was important to show that his marriage to Hernandez was unstable and caused him emotional stress. However, the record demonstrates that the jury was made thoroughly aware through other evidence of the emotional stress caused by appellant's volatile marriage. The jury was aware that appellant and Hernandez separated and reunited many times. The jury also

learned that, following the final break six months prior to the offense, both appellant and Hernandez had begun new relationships. Witnesses also testified regarding the verbal, emotional, and physical abuse that appellant suffered from Hernandez. Thus, the probative value of the evidence and the proponent's need for the evidence were not high.

On the other hand, the potential for the excluded evidence to impress the jury in an irrational way was high. The evidence would likely foster the sort of comparative-worth analysis that is barred by Rule 403. *See Hayden*, 296 S.W.3d at 552. Further, it is evidence designed to elicit a negative emotional response regarding the victim's character. Evidence that depends on mere sympathy or emotional response should not be considered in the jury's determination of the defendant's deathworthiness. *Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999).

The trial court's decision to disallow the evidence of Hernandez's drug use and sexual behavior does not fall outside the zone of reasonable disagreement. Point of error twelve is overruled.

We affirm the judgment and sentence of the trial court.

Delivered: November 21, 2012
Publish