**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00144-CR**
_____

**LAURO ELIUD SALINAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-11-15643-CR**

**MEMORANDUM OPINION**

A Montgomery County Grand Jury indicted Lauro Eliud Salinas for assaulting a family member or person with whom he had a dating relationship, "Michelle," by impeding breath or circulation, a third-degree felony.[1] *See* Tex. Penal Code Ann. § 22.01(b)(2)(B). The jury found Salinas guilty. Sentencing was to the trial court,

---

[1]We use pseudonyms to refer to the alleged victim and the victim's family members. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

1

which found the enhancements "true" and sentenced Salinas to fifty years of confinement. In a single issue, Salinas challenges the trial court's judgment and complains it erred in denying the redaction of a 911 recording that mentioned a gun being present. In support of his issues, he asserts, among other things, the complained-of evidence was irrelevant, and the prejudicial effect outweighed the probative value. We hold the trial court did not abuse its discretion in admitting the complained-of portion of the 911 call. We affirm the trial court's judgment as discussed below.

## INITIAL MATTER: BRIEFING

In his original brief, filed in August 2024, Salinas raises the sole issue mentioned above. In January 2025, the State filed its brief, responding to Salinas's sole issue. Over eight months later, in August 2025, Salinas filed another document titled "Appellant's Brief on the Merits," ("second brief") which the State moved to strike. Salinas did not file a motion for leave to file the second brief. In the second brief, Salinas restated the issue from his opening brief plus added a second point of error, challenging admission of another statement in the 911 recording that the appellant "would be aggressive towards responding officers." In its Motion to Strike, the State argues that Salinas's second brief was untimely, and he failed to obtain leave of the Court to file it. Therefore, the State contends that Salinas's second issue is not properly before the Court.

Texas Rule of Appellate Procedure 38.1 requires that an appellant designate all issues for review in the original brief. *See* Tex. R. App. P. 38.1; *Garrett v. State*, 220 S.W.3d 926, 928 (Tex. Crim. App. 2007). A reply brief to an appellee's brief is due twenty days after the appellee files its brief. Tex. R. App. P. 38.6(c). An appellant generally may not raise a new issue in a reply brief because Rule 38.3 allows appellate courts to decide the matter prior to receiving the reply brief. *Chambers v. State*, 580 S.W.3d 149, 161 (Tex. Crim. App. 2019). "[T]he purpose of a reply brief is to address 'any matter in the appellee's brief.'" *Houston v. State*, 286 S.W.3d 604, 612 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting Tex. R. App. P. 38.3). Therefore, "inclusion of an argument concerning [a] new issue not addressed in either appellant's or appellee's brief would generally be inappropriate for a reply brief." *Id.* While "[a] brief may be amended or supplemented with the court's permission 'whenever justice requires, on whatever reasonable terms the court may prescribe[,]'" here, Salinas did not ask for permission to supplement or amend his brief. *Id.* (quoting Tex. R. App. P. 38.7). That said, appellate courts can consider arguments and authorities in a reply brief that are related to the arguments in the original brief. *Chambers*, 580 S.W.3d at 161.

Salinas did not raise his second issue in his opening brief, and it is not responsive to anything raised in the State's brief nor did he ask for permission to amend or supplement his brief. *See* Tex. R. App. P. 38.1, 38.7; *Garrett*, 220 S.W.3d

3

at 928; *Houston*, 286 S.W.3d at 612. Further, Salinas's second issue about the statement on the 911 call that he would be aggressive with officers is unrelated to his first issue in his opening brief, which dealt with the statement about the gun. *See Chambers*, 580 S.W.3d at 161. The record shows that although they originated in the same 911 call, Salinas presented these statements as separate and distinct complaints during the trial court's hearing. The trial court treated them that way by first ruling on the statement about the gun, then hearing and ruling on separate arguments about whether the caller believed Salinas would be aggressive. We conclude that it is inappropriate for Salinas to raise an unrelated issue that he failed to present in his opening brief, and we will not address it. *See id.*; *see also* Tex. R. App. P. 38.1, 38.7; *Garrett*, 220 S.W.3d at 928; *Houston*, 286 S.W.3d at 612. Therefore, we reach the merits of the sole issue raised in Salinas's opening brief. *See* Tex. R. App. P. 38.1; *Garrett*, 220 S.W.3d at 928; *Houston*, 286 S.W.3d at 612.

### BACKGROUND

**Trial Testimony**

Deputy Payton Palmer, a patrol deputy with the Montgomery County Sheriff's Office (MCSO), testified at trial. Palmer said that on July 11, 2022, he worked the 6 p.m. to 6 a.m. shift. He explained that at about 12:30 a.m., he responded to a domestic violence call at a Splendora address in Montgomery County.

4

Palmer testified that when he first arrived, he observed Michelle, who had blood on her T-shirt. He also observed "numerous other injuries" to Michelle, including a swollen lip, scratches on her face, scratch marks to her neck, abrasions to her arm, and petechiae on her left ear. He explained that in strangulation cases, he is trained to look for certain things, including "bruising, scratching, bleeding, [and] petechiae." Palmer testified that photographs showed marks on Michelle's neck which were signs of strangulation, and from his training, they appeared to be from fingers.

Palmer described the scene of the incident, including an ashtray dumped over, and said that alcohol was present. He testified that Michelle was "upset, and she was fearful." Michelle spoke "broken English," so her twenty-year-old son, "Josh," helped translate for Palmer. Palmer learned that Michelle's younger son, "Emmett," who was eight, witnessed the incident. Palmer said that he spoke with five people at the residence, who all told him the same thing. Josh and Michelle both reported that she was strangled. Michelle also reported that she had alcohol that night.

Palmer testified that he called EMS given the "seriousness of the injuries" and due to the "injuries to her neck area." EMS arrived and transported Michelle to the hospital. Palmer followed the EMS transport to the hospital, and he spoke with Michelle and completed a "Strangulation Supplement Form." According to Palmer,

5

Michelle relayed that she felt "pain in her shoulder, her neck, and raspy voice and swollen tongue."

Palmer testified that Salinas was nowhere on the scene that night, and Palmer could not locate him that night. During the investigation, he identified Salinas as a suspect. Palmer said that based on his investigation, he determined an assault strangulation occurred and filed a felony warrant.

Michelle testified at trial but suggested she did not want to be there, because she was afraid. The evidence established that Salinas and Michelle were romantically involved; Salinas lived with her and her children in Splendora. She explained that she and Salinas were at a party the night of the incident, where they both drank alcohol.

Michelle said that they rode home from the party in an Uber. Once they arrived home, they stayed outside but began to argue. Michelle testified that she did not know if Salinas was angry that she had talked to the Uber driver or for something else. She described Salinas hitting her twice in the face and pushing her back in the chair. Michelle said that Salinas then put his hands on her neck, and she lost consciousness. She testified that when she came to, she heard her younger son, Emmett, telling Salinas to leave her alone, and Emmett was afraid.[2]

---

[2]Michelle testified that Emmett was seven whereas Palmer testified that he was eight.

She explained that when Salinas put his hands around her neck, it hurt, and "I couldn't breathe. I couldn't move. Everything kind of got cloudy, and I lost consciousness." After she awoke, she told her son to call the police. According to Michelle, Salinas left when he heard her say that. Her older son, Josh, called the police. She testified that she was afraid for her children because she did not know if Salinas would return.

Dr. Bhushan Kukkalli, an emergency room physician who treated Michelle the night of the incident, also testified. Kukkalli explained that she and EMS reported that she was strangled by "the significant other." He noted Michelle primarily complained that her boyfriend hit and choked her.

Kukkalli testified that Michelle reported that she passed out. He explained that usually when people say that it "means there was a temporary loss of blood supply to the brain." He also told the jury that when someone loses consciousness while being choked, it was serious, because they "have to look for vascular injuries, big vessels which supply blood to the brain." He testified that this results in the loss of the ability to breathe and loss of circulation. He noted that in strangulation patients, they look for hematomas and petechiae. Kukkalli said that he observed large hematomas and petechiae around her mouth, left ear, and left cheek. Kukkalli said that based on what Michelle reported plus her injuries, it was consistent with strangulation and a loss of consciousness.

Paramedic Amy Sewell testified at trial regarding her treatment of Michelle. Sewell said that on June 11, 2022, law enforcement called EMS to a Splendora address to evaluate Michelle. Sewell observed that Michelle had a swollen, bloody lip with abrasions on both sides of her neck. Sewell said that Michelle reported she was in pain and admitted drinking alcohol.

Sewell testified that Michelle said "[h]er husband" caused the abrasions around her neck when he put his hands around her throat and choked her. Michelle told Sewell that she lost consciousness, which is why Sewell believed Michelle should go to the hospital. According to Sewell, Michelle told her that "she had been unconscious for possibly up to five minutes." Sewell testified that they transported Michelle to the hospital.

**911 Call and Hearing Regarding Admissibility**

Michelle's son, Josh, spoke with 911 about the events.[3] This 911 recording was admitted and played for the jury during Palmer's testimony. The trial court conducted a hearing outside the jury's presence pertaining to Salinas's request that it redact three specific portions of the 911 call. As relevant to the appeal, the complained-of portion included a reference to Salinas leaving the scene with a firearm.

---

[3]On the recording, the initial caller is an unidentified female, who says she is a "friend," but less than a minute into the call, Josh begins speaking with the 911 operator and communicates for the call's duration.

Salinas identified the objectionable material regarding the gun being located at the time stamp between forty and forty-four seconds, which included this exchange:

[OPERATOR]: What's going on there, [Josh]?

[JOSH]: My mom's boyfriend was here, and he, um, he hit her. And then he took off with a gun.

The operator kept asking questions, and Josh responded to the questions by explaining that Salinas left and described his clothing. As to the possession of the gun, Salinas argued it was inflammatory, since there was no gun involved in the offense and it was only mentioned to make him sound more dangerous, it was irrelevant and more prejudicial than probative. The defense also contended that Salinas having a gun was a bad act, since he is a convicted felon. Among other things, the State asserted that it was relevant to show why Michelle's family called the police and why this is a dangerous situation. The trial court noted that simply having a gun is not considered a bad act in Texas, and the jury did not know that Salinas was a convicted felon. The trial court ruled that the statement about Salinas leaving with a gun was admissible. It reasoned the evidence was relevant and that the probative value was not greatly outweighed by the prejudicial effect.

**Other Evidence**

Other evidence admitted at trial included: medical records from Michelle's hospital visit after the assault; photographs of Michelle's injuries and the scene; and the paramedic's report.

## ISSUE

Salinas complains that the trial court erred when it admitted the unredacted portion of the 911 call over his objection that it was irrelevant and the probative value was outweighed by the prejudicial impact.[4] The complained-of portion of the 911 call includes Josh telling the operator that Salinas left with a gun, which Salinas characterizes as "extraneous offense" evidence. In his opening brief, Salinas also contends that this violated the 14th Amendment. That said, since he did not object at trial based on the 14th Amendment, he has failed to preserve that complaint for our review. *See* Tex. R. App. P. 33.1(a).

## STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's admission of evidence under an abuse-of-discretion standard. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)

---

[4]In his opening brief, Salinas also complains about "Article 404 of the Texas Code of Criminal Procedure[,]" which does not exist. Yet, Texas Rule of Evidence 404 governs "extraneous offense evidence," so we have addressed that along with his complaints that the objected-to portion of the 911 call was irrelevant, and the probative value of the evidence was outweighed by the prejudicial effect. *See* Tex. R. Evid. 401, 402, 403, 404.

10

(discussing in the context of a 404(b) ruling); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g); *see also De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. 2009) (explaining that a trial court's rulings under Rules 403 and 404 are reviewed for abuse of discretion). "As a general rule, an appellate court reviewing a trial court's ruling on the admission or exclusion of evidence must do so in light of the arguments, information, and evidence that was available to the trial court at the time it ruled." *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (citations omitted). We uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (citations omitted). We do not disturb a trial court's ruling if it is correct on any legal theory of law applicable to that ruling. *See De La Paz*, 279 S.W.3d at 344.

"Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence is generally admissible. *Id.* 402. A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice. *Id.* 403.

Under Rule 403, it is insufficient that the evidence is prejudicial, since "all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (citation omitted); *see also Bluntson v. State*, 728 S.W.3d 87, 109–10 (Tex. Crim. App. 2025).

11

Rather, for 403's exclusion to apply, the party must be unfairly prejudiced by the evidence, which means there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value[.]" *Bluntson*, 728 S.W.3d at 110 (citations omitted). Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, an emotional one. *Id.* (citation omitted); *see also Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993). A trial court's Rule 403 balancing analysis generally includes, but is not limited to, four factors: (1) the evidence's probative value; (2) the potential of the evidence to impress the jury in an irrational but nevertheless indelible way; (3) the time required to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); *see also Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (citation omitted); *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Additionally, same transaction contextual evidence must meet Rule 403's balancing requirement. *See Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). That said, "the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the whole criminal transaction." *Id.* (citations omitted).

Rule 404(b) of the Texas Rules of Evidence provides in pertinent part:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses[.] This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Tex. R. Evid. 404(b). Rule 404(b)'s list of enumerated purposes for which extraneous offense evidence may be admissible is neither exclusive nor exhaustive. *Montgomery*, 810 S.W.2d at 388. Extraneous offense evidence may be admissible if it has relevance apart from a tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387. "[M]ere possession of a handgun," would not be "in and of itself, a criminal offense or a bad act." *Robinson v. State*, 236 S.W.3d 260, 269–70 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing Tex. Penal Code Ann. § 46.15) (other citation omitted) (stating same in context of possessing handgun in temporary home while traveling). Texas courts recognize "consciousness of guilt" as an exception to Rule 404(b)'s general prohibition against admitting extraneous offense evidence. *See Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Madden v. State*, 911 S.W.2d 236, 243 (Tex. App.—Waco 1995, pet. ref'd); *see also Longoria v. State*, No. 09-13-00169-CR, 2014 WL 2922236, at *3 (Tex. App.—Beaumont June 25, 2014, pet. ref'd) (mem. op., not designated for publication) (explaining that

13

evidence that was relevant to perpetrator's consciousness of guilt, among other things, was admissible for purposes other than character conformity under 404(b)).

Texas courts use a two-step analysis to determine the admissibility of extraneous offenses or uncharged acts. *See Rogers v. State,* 853 S.W.2d 29, 32–33 (Tex. Crim. App. 1993). Courts first determine whether the evidence is relevant to a material issue in the case and second whether the relevant evidence should be admitted as an exception to Rule 404(b). *Id.*

## ANALYSIS

From the start, the defense put alcohol use and the reliability of witnesses at issue. In the defense's opening statement, it noted that alcohol was a factor in the incident and contended that people would try to make this seem worse than it is, noting that "[k]ids are very good at telling stories and embellishing[.]" Defense counsel also stated in opening that "I think the evidence is going to show that alcohol was a factor in this case with regards to not only, you know, what may or may not have happened but also, you know, why people may or may not have said things that they said[.]" At the time the trial court ruled to admit the complained-of portion of the 911 call, Salinas had already made these arguments. *See Dragoo*, 96 S.W.3d at 313.

During the hearing, the trial court correctly noted that possessing a gun in Texas, without the jury knowing that Salinas was a convicted felon, was not a bad

14

act, thus, would not preclude the admission of Josh's statement that Salinas left with a gun. *See Robinson*, 236 S.W.3d at 269–70; *see also* Tex. R. Evid. 404(b)(1) (explaining evidence of other crimes, bad acts, or wrongs are inadmissible to show character conformity). Josh's statements to the 911 operator about Salinas taking off with a gun after hitting Michelle explained why Josh called the police, tended to negate the notion that he was embellishing which the defense alleged, was relevant to Salinas's state of mind, and provided context for what unfolded at the scene, thus it was relevant and probative for those purposes. *See* Tex. R. Evid. 401. The trial court could have concluded that Salinas fleeing the scene with a gun had relevance apart from character conformity, since it tended to show Salinas's consciousness of guilt and that the altercation was not an accident but something intentional. *See id*. 404(b)(2); *see also Hedrick*, 473 S.W.3d at 830; *Madden*, 911 S.W.2d at 243; *Longoria*, 2014 WL 2922236, at *3.

This evidence also was not unfairly prejudicial under a Rule 403 balancing test. *See Hernandez*, 390 S.W.3d at 324; *Mechler*, 153 S.W.3d at 440. The State spent little time focusing on Salinas having a gun. *See Hernandez*, 390 S.W.3d at 324; *Mechler*, 153 S.W.3d at 440. The evidence was important to show the context of what unfolded at the scene, explain why Salinas was not there, and show why witnesses called 911. *See Hernandez*, 390 S.W.3d at 324; *Mechler*, 153 S.W.3d at 440. Finally, it is unlikely that this brief mention of the gun, which took only seconds

15

of the 911 call, would impress the jury in an irrational but indelible way. *See Cohn*, 849 S.W.2d at 820. As noted, possessing a handgun was not unfairly prejudicial because mere possession of a handgun in Texas is not, in and of itself, a criminal offense or a bad act. *See* Tex. Penal Code Ann. § 46.15; *Robinson*, 236 S.W.3d at 269–70. The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice given the contextual information it provided, which was essential to understanding what precipitated the 911 call, witnesses' reactions, Salinas's state of mind, and why they reported what they did to 911. *See* Tex. R. Evid. 401, 403, 404(b); *Hernandez*, 390 S.W.3d at 324; *Mechler*, 153 S.W.3d at 440; *Cohn*, 849 S.W.2d at 820; *see also Swarb*, 125 S.W.3d at 681 (explaining same transaction contextual evidence must meet Rule 403's balancing requirement).

We hold the trial court was within the zone of reasonable disagreement when it determined the probative value of the statement about the gun was not substantially outweighed by the danger of unfair prejudice, thus the trial court did not abuse its discretion when it admitted this evidence. *See De La Paz*, 279 S.W.3d at 343; *Moses*, 105 S.W.3d at 627; *Wheeler*, 67 S.W.3d at 888; *Montgomery*, 810 S.W.2d at 391. We overrule Salinas's sole issue on appeal.

16

## CONCLUSION

Having overruled Salinas's sole issue, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on December 30, 2025
Opinion Delivered April 15, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.