# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00137-CR

**Joe Allen Page, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
NO. 2010-229, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Joe Allen Page of the offense of aggravated sexual assault of a child. *See* Tex. Penal Code § 22.021(a)(2)(B). Punishment was assessed at 75 years' imprisonment. In three points of error on appeal, Page asserts that the evidence is insufficient to support his conviction, that the district court abused its discretion in limiting Page's voir-dire examination of the prospective jurors, and that the district court abused its discretion in permitting a witness to testify that the victim was truthful. We will affirm the judgment of conviction.

## BACKGROUND

Page was charged with sexually assaulting his step-granddaughter, J.F., who was eleven years old at the time of the alleged assault. The case was tried before a jury. Evidence considered by the jury, which we discuss in more detail below as it is relevant to Page's points of error, included the testimony of J.F., who was fifteen years old at the time of trial; D.F., J.F.'s mother and the person to whom J.F. had made her initial outcry; Michael Collie, the police officer to whom

D.F. had reported the assault; Connie Conley, Page's ex-wife who was present when Page was confronted about the allegations; various other members of Page's family; and Melissa Rodriguez, a forensic interviewer who had interviewed J.F. about the incident. The jury found Page guilty as charged and the case proceeded to punishment. The jury assessed punishment as noted above, and the district court sentenced Page in accordance with the jury's verdict. This appeal followed.

**ANALYSIS**

**Evidentiary sufficiency**

In his first point of error, Page asserts that the evidence is insufficient to sustain his conviction. According to Page, the State's case relied entirely on "undocumented admissions, guesswork of interested witnesses, and extraneous conduct unrelated to the allegations of the victim." In Page's view, there is no evidence tending to show that he committed the offense.

When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virgina*, 443 U.S. 307, 319 (1979). We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the jury resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict, and we defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony. *Jackson*, 443 U.S. at 318; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

2

The evidence in this case included the testimony of the victim, J.F. J.F. testified that in June 2008, she was staying overnight at the home that belonged to her grandmother and her grandmother's then-husband, Page. J.F. recounted how she was sleeping on the couch in the living room when she remembered waking up with Page "kneeling beside [her]," with his hand "in [her] pants" and below her swimsuit, which she was wearing at the time. According to J.F., Page's finger was inside of her sexual organ. J.F. got off the couch, went to the bathroom (where she remained for what she estimated was thirty minutes), and then returned to the couch and covered herself with a blanket. J.F. explained that Page had remained in the living room with her for approximately thirty minutes, sitting on the other side of the couch and "watching" her. Eventually, J.F. recalled, Page left the room, after telling her, "I'm sorry. Papa Joe has been bad. I'm going to go to sleep now."

J.F. further testified that she decided not to tell anyone about what had happened because Page had always been "nice . . . to everybody else" and also because she thought that no one would believe her if she told. Approximately two years later, however, J.F. drafted (but did not send) a text message to a friend about what had happened to her, and her mother discovered the text message while looking through J.F.'s phone and asked her about it. J.F. then told her mother what had happened.

J.F.'s mother, D.F., also testified and recounted what had occurred when she discovered her daughter's text message. According to D.F., when she had asked J.F. about the message, J.F. "just blew up. She just became very crazy, very emotional. She began yelling at me, wanting to know why I was looking through her phone. She tried to grab the phone from me. She said that she didn't want us to know that, that that had been 'her secret,' as how she titled it to be,

3

her secret. She just kept yelling at me and screaming. And she was just very crazy." Eventually, D.F. explained, J.F. told her about what Page had done to her. D.F.'s testimony concerning what J.F. had told her was consistent with J.F.'s testimony.

Approximately one week later, D.F. decided to tell Connie Conley, J.F.'s grandmother and Page's wife, about what had happened. D.F. testified that she drove to Page's house with her sister-in-law and Conley's daughter, Jennifer Davis. Once there, D.F. asked Conley to talk to her and Davis outside, and then told Conley what J.F. had told her. Together, the three women then went inside the house and confronted Page with what J.F. had said. During the confrontation, D.F. testified, Page eventually admitted to touching J.F. and added "that it had happened in the past" and that he was "sorry" for what he had done.

D.F. further testified that, later that night, Page left the house and did not return. D.F. subsequently found out that Page had tried to kill himself and that he had been admitted into a hospital. D.F. drove to the hospital to find out if Page was "dead or alive." Once there, D.F. found Page in a hospital room, where he again admitted to touching J.F. According to D.F.,

> He told me that he tried to take his life the night before, and he had told everybody at the hospital what he did to [J.F.] And he said that the doctors and nurses knew that he needed help, and he was going to get help. And he said that he loves me and my family, and he would do anything he could to make it better, that he was going to do better. And he told me that he was sorry he had touched [J.F.], and it would never happen again. If I would just give him another chance, that he would be good.

After that, D.F. decided to call the police.

The police officer who was assigned to the case was Officer Michael Collie of the Luling Police Department. Collie testified that, after talking with D.F. over the phone, he had her come to the police station and provide a written statement. Then, Collie arranged for J.F. to be

4

interviewed at Roxanne's House, the Child Advocacy Center in San Marcos.[1] Collie testified that the interview was recorded and that he had observed the interview from a television monitor as it occurred. Collie also interviewed other witnesses in the case, including Conley and Davis. Collie testified that, when he met with Conley, Conley provided him with what she purported to be a will and a suicide note that had been written by Page.[2] The handwritten document, which was admitted into evidence, contained the following:

> My Last Will & Testament
>
> I, Joe Allen Page, give all that I own and have to my wife Connie Page.
>
> I'm finally out of pain and misery! You'll never know how bad my life has been, I too was molested over and over when I was young.
>
> [Page's signature]
>
> Sorry! To all that I've hurt.
>
> Please have me cremated.

---

[1] The interview was conducted by Melissa Rodriguez, the program director of Roxanne's House. Rodriguez testified that, during the interview, J.F. had made an outcry of sexual assault. Rodriguez did not, however, testify as to the details of what J.F. had told her, as the district court sustained Page's repeated objections to the testimony on hearsay grounds. We discuss Rodriguez's testimony in more detail below as it is relevant to Page's other points of error.

[2] A handwriting expert for the State subsequently testified that she had compared the note to another document written by Page and had concluded that there was a "virtual certainty" that the suicide note had in fact been written by Page. Other witnesses provided testimony tending to show that Page had contemplated suicide. Page's stepson and J.F.'s father, R.F., testified that, on the night that Page was confronted by D.F., Conley, and Davis, Page called R.F. and told him that he was "standing on top of a bridge right now" and that his "life [was] over," but that he was "not going to jail" and that "they will find me down the river tomorrow morning." R.F. testified that he advised his stepfather, "Don't do anything stupid. You don't want to take your own life. You need to ask for forgiveness for what you've done." Additionally, Alan Lee, a family physician who had treated Page for several years, testified that Page had told him that he was suicidal and had considered killing himself with a gun in a field, but "just couldn't pull the trigger."

Connie Conley, Page's ex-wife, testified that the night when she, D.F., and Davis had confronted Page, Page was "sitting in a dark room by himself," and asked them, "What's the problem?" Conley responded, "Well, it looks like you like molesting little girls." Conley testified that Page replied, "If I did, I did it a long time ago," which Conley interpreted as meaning "he did it." After that, Conley recalled, she went to her bedroom, "loaded up a .357," but "took a big breath and put it down," deciding that Page was "not worth a bullet and I'm not going to jail for him." Eventually, Conley recalled, Page left the house and took her car. Conley testified, "I tried calling him on the phone constantly. He wouldn't pick up. But I did tell him to kill himself, and I hoped he did." Conley added, "I didn't care much about him, but I cared about my car. I kind of wanted that back. I was hoping he didn't drive it off a bridge."

Page's stepdaughter, Jennifer Davis, also testified about the night in which she, D.F., and Conley had confronted Page. Davis testified that, at first, Page denied touching J.F. but that he eventually confessed, telling them, "Yes, I did. I did it, and I did it to all of you."[3] Davis testified that, after that, Conley asked her and D.F. to leave, and they did so. Later, when Davis learned that Page had been admitted into a hospital after attempting suicide, she visited him in the hospital, where, Davis testified, the following occurred:

> We talked, and we both cried. And he said, "I'm really sorry what I have done to little [J.F.] I'm very sorry for what I've done to [D.F.] And I'm very sorry that I ever asked you to have sex." And he said, "From here on out, things are going to be totally different." And that's what we talked about.

---

[3] Throughout trial, evidence was admitted tending to show that Page had a history of committing sexually offensive behavior, including touching, spying on, and sexually harassing D.F. and Davis, who were his daughter-in-law and stepdaughter, respectively. Additionally, there was other evidence admitted that tended to show that, on another occasion when J.F. was younger, Page had exposed his genitals to her.

. . .

> He said, yes, that he had put his hands on [J.F.]  He said he had done some things with [J.F.] and he regretted it and he was very sorry about it.  He was extremely—seemed very remorseful about it, that he wanted to fix everything, like he thought everything was just going to be fixed and go back to normal.

Davis later drove Page home from the hospital.  According to Davis, "[T]he plan was to get him over to the house so the police could come and pick him up."  Davis testified that, on the drive home, Page had continued talking to her about what he had done:

> He talked about all of the regrets.  He talked about how he was sorry for everything that he had done, he was sorry for doing that to little [J.F.]  He wanted little [J.F.] to know—he was going to let her know that he would never never touch her again.  And he wanted her to feel safe and know that he wasn't going to do that anymore.  And he wanted—and he apologized about doing the things that—attempting to do things to [D.F.] and I, as well.  And he just kept talking about how it was going to be totally different, completely different.

When Page arrived home, he was arrested.

Two witnesses testified for the defense:  Page's biological daughter, Jessica Shaffer; and Page's biological son, Jeremy.  Shaffer testified that she did not recall J.F. being left alone with Page during the weekend when the assault allegedly occurred.  Jeremy testified as to his recollection of the events that occurred on the weekend of the alleged assault, including that there was a party involving the entire family and that alcohol was served.

Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that the evidence is sufficient to support Page's conviction.  The victim, J.F., provided detailed testimony describing what Page had done to her.  Three witnesses—Page's daughter-in-law, ex-wife, and stepdaughter—each testified that Page had

confessed to committing the crime. According to the evidence presented, he did so on at least three occasions: at his house on the night when he was confronted with the accusation; at the hospital when he was speaking with D.F.; and on the drive home from the hospital when he was speaking with Davis. Additionally, the jury could have reasonably inferred from Page's attempted suicide and other behavior that he had a consciousness of guilt. And, Page's handwritten suicide note contained statements that, the jury could have reasonably inferred, were further admissions of guilt, including the statement that he, "too, was molested over and over when [he] was young." From this and other evidence, a rational jury could have found beyond a reasonable doubt that Page had committed the offense of aggravated sexual assault of a child as charged. *See, e.g.*, *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Shaw v. State*, 329 S.W.3d 645, 657 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd). We overrule Page's first point of error.

**Limitation on voir dire**

In his second point of error, Page asserts that the district court abused its discretion in limiting his voir-dire examination of the prospective jurors. Specifically, Page complains of the following:

[Prospective juror]: Aren't there alternative interview techniques for professionals to determine if a kid is a liar or if they think they're telling the truth?

[Defense counsel]: Well, that brings up a whole other issue there. They have things called forensic interviews [sic], which are law enforcement people who are interviewing these children.

| | |
|---|---|
| [Prosecutor]: | Judge, I'm going to object to that. That's a misstatement that forensic interviewers are in any way associated with law enforcement. |
| [The Court]: | Sustained, Counsel. |
| [Defense counsel]: | Well, I don't agree with it. |
| [The Court]: | Well, you may not agree with it, but I've made the ruling, Counsel, so move along. |

Defense counsel then moved on to another line of questioning.

We review a trial court's ruling regarding the limitation of voir dire for abuse of discretion. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012); *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). In this context, our review is focused on whether appellant proffered a proper question regarding a proper area of inquiry. *Hernandez*, 390 S.W.3d at 315. A "proper" question is one which seeks to discover a prospective juror's views on an issue applicable to the case. *Rhoades v. State*, 934 S.W.2d 113, 118 (Tex. Crim. App. 1996). A trial court abuses its discretion only when a proper question about a proper area of inquiry is prohibited. *Barajas*, 93 S.W.3d at 38; *Allridge v. State*, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988). A trial court does not abuse its discretion in restricting voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions. *Hernandez*, 390 S.W.3d at 315.

In this case, Page argues that counsel's above statement regarding forensic interviews was proper because it "concerned anticipated testimony from a forensic interviewer connected to law enforcement and the role that testimony would play in the prosecution." The State responds that counsel's statement was misleading and, therefore, that the district court was within its discretion

9

in sustaining the State's objection.  The State also contends that Page failed to preserve error on this complaint.

We agree with the State that Page failed to preserve error.  In order to preserve error on the trial court's limitation of voir dire, an appellant must show "that he was prevented from asking particular questions that were proper."  *Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App. 2003); *Dewalt v. State*, 307 S.W.3d 437, 457 (Tex. App.—Austin 2010, no pet.).  If an appellant does not actually frame a question to the trial court, nothing is preserved for review.  *Caldwell v. State*, 818 S.W.2d 790, 794 (Tex. Crim. App. 1991), *overruled on other grounds*, *Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995); *Dewalt*, 307 S.W.3d at 457.  An appellant does not preserve error by informing the trial court of the general subject area from which he wishes to propound questions.  *Sells*, 121 S.W.3d at 756; *Caldwell*, 818 S.W.2d at 794; *Dewalt*, 307 S.W.3d at 457.  "Potentially, a wide range of specific questions—both proper and improper—could [be] asked within [a proper subject] area."  *Caldwell*, 818 S.W.2d at 794; *Dewalt*, 307 S.W.3d at 457.  That the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not enough to preserve error because the trial court might have allowed the proper question had it been submitted for the court's consideration.  *Sells*, 121 S.W.3d at 756; *Dewalt*, 307 S.W.3d at 457.

Here, Page argues that he was prohibited from asking questions concerning the forensic interview in this case.  However, he never proposed any specific questions concerning the interview or the interviewer to the district court, and thus never obtained a ruling on whether such questions would have been allowed.  Accordingly, there is nothing for us to review.  *See* Tex. R. App. P. 33.1; *Dewalt*, 307 S.W.3d at 457.

10

Additionally, even if error had been preserved, we could not conclude on this record that the district court abused its discretion in sustaining the State's objection to counsel's statement. The district court could have reasonably found that the statement gave the jury a misleading impression that forensic interviewers were law-enforcement officials. They are not. In fact, Melissa Rodriguez, the forensic interviewer in this case, testified that she is the program director of Roxanne's House at the Women's Center of Hays and Caldwell Counties, which provides advocacy services to child victims of abuse. There is some connection between the Center and law enforcement, but the record reflects that is limited. When asked if her organization was "affiliated with any sort of law enforcement agency," Rodriguez testified, "We have a written partnership with different agencies that investigate and prosecute child abuse cases, but we do not work for them. We are not funded by them. We just have a written agreement to coordinate the efforts in these cases." Thus, it would not have been an abuse of discretion for the district court to conclude that it was misleading for defense counsel to characterize forensic interviewers as "law-enforcement people" and to sustain the State's objection to counsel's statement on that ground. We overrule Page's second point of error.

**Testimony on truthfulness**

In his third point of error, Page asserts that the district court abused its discretion in allowing the forensic interviewer, Melissa Rodriguez, to express her direct opinion regarding the victim's truthfulness. Specifically, Page complains of the following testimony:

| [Prosecutor]: | And on this particular occasion, did you take any steps to ensure that [J.F.] was telling the truth? |
|---|---|
| [Rodriguez]: | We did go through the qualifying process— |

| | |
|---|---|
| [Defense counsel]: | Your Honor, I am going to object to that question. I think they are trying to get to the credibility of the witness, when they say "take steps to ensure the witness is telling the truth." She has no idea whether the witness is telling the truth, and her opinion is not helpful to the jury, who is the sole judge of that. |
| [The Court]: | Overruled with regard to that question, but obviously that— |
| [Prosecutor]: | I'm not asking her whether or not. |
| [The Court]: | I understand. Overruled as to the question as propounded. |
| [Prosecutor]: | So did you take any steps with her to ensure that she knew the difference between the truth and a lie? |
| [Rodriguez]: | Yes, we do at every interview. I did ask her if she knew the difference between truth and lie, and she did promise to tell the truth. |

Rodriguez then continued with her testimony, explaining how J.F. had "stayed on track" during the interview and how Rodriguez had made sure to avoid asking J.F. leading questions.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

To be admissible, expert testimony must, among other requirements, "assist" the trier of fact. *See* Tex. R. Evid. 702. "Expert testimony assists the trier of fact when the jury is not qualified to 'the best possible degree' to determine intelligently the particular issue without the help

12

of the testimony." *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) (quoting *Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990)). "But, the expert testimony must aid—not supplant—the jury's decision." *Id*. "Expert testimony does not assist the jury if it constitutes 'a direct opinion on the truthfulness' of a child complainant's allegations." *Id*. (quoting *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993)).

In arguing that Rodriguez's testimony was inadmissible as a direct opinion on J.F.'s truthfulness, Page compares Rodriguez's testimony to the testimony that was at issue in *Sessums v. State*, 129 S.W.3d 242 (Tex. App.—Texarkana 2004, pet. ref'd). In that case, several experts testified as to the factors that they used to determine if a child was telling the truth and then further testified either that they believed the child in that case was truthful or that the child had exhibited characteristics of truthfulness. *See id*. at 247-48. The court held that such testimony was inadmissible as a direct opinion on the truthfulness of the child. *See id*. at 248.

This case is distinguishable from *Sessums*. Here, the closest Rodriguez came to commenting on J.F.'s truthfulness was testifying that J.F. had "promised to tell the truth." It would not be outside the zone of reasonable disagreement for the district court to find that this was not a direct opinion as to whether J.F. was being truthful. The district court could have reasonably found that this testimony was merely a description of what was said during the interview. Unlike the witnesses in *Sessums*, Rodriguez did not testify that she believed J.F. was being truthful or that J.F. had displayed what Rodriguez believed to be characteristics of truthfulness; she merely repeated what she had asked J.F. during the interview and how J.F. had answered in response. Accordingly, it would not be outside the zone of reasonable disagreement for the district court to conclude that Rodriguez's testimony would not supplant the jury's decision on J.F.'s credibility,

13

but would instead assist the jury in understanding the interview process. *See Reyes v. State*, 274 S.W.3d 724, 730 (Tex. App.—San Antonio 2008, pet. ref'd); *Warren v. State*, 236 S.W.3d 844, 849 (Tex. App.—Texarkana 2007, no pet.); *see also Bryant v. State*, 340 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd) ("Testimony by an expert witness . . . that provides useful background information to aid the jury in evaluating the testimony of another witness is admissible."); *Reynolds v. State*, 227 S.W.3d 355, 366 (Tex. App.—Texarkana 2007, pet. ref'd) (concluding that testimony explaining interview process is admissible and observing that simply because witness uses word "truth" in her testimony does not necessarily mean witness is giving her opinion as to child's truthfulness). On this record, we cannot conclude that the district court abused its discretion in allowing the testimony. We overrule Page's third point of error.

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Field

Affirmed

Filed: August 15, 2013

Do Not Publish

14