**Opinion filed May 31, 2018**



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00124-CR
_____

## CHRISTOPHER DOUGLAS CORNETT, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR23048**

## MEMORANDUM OPINION

The jury convicted Christopher Douglas Cornett of continuous sexual abuse of a young child. The trial court assessed his punishment at confinement for thirty-five years in the Institutional Division of the Texas Department of Criminal Justice. Appellant brings four issues on appeal. In his first and second issues, Appellant contends that the trial court erred in admitting evidence of Appellant's extraneous bad acts. In his third issue, Appellant contends that the trial court erred when it

allowed the State's expert to testify that rapid dilatation of the complainant's anus was consistent with sexual abuse. In his fourth issue, Appellant contends that the cumulative effect of his first three issues requires a reversal of his conviction. We affirm.

*Background Facts*

The victim in this case, ZC, is the adopted daughter of Appellant. Prior to being adopted, Child Protective Services removed ZC and her younger sister from their home due to neglectful supervision and physical neglect. The removal occurred when ZC was four years old. ZC suffered from developmental and behavioral issues, and she was placed in a residential treatment center.

Appellant and his wife, Amanda Sharp, adopted ZC and her sister when ZC was five years old. ZC continued to suffer from developmental and behavioral problems, making it difficult for Sharp to manage her alone while Appellant worked. Consequently, Appellant left his job in order to help care for ZC. This led to financial difficulties, which placed a strain on Appellant's marriage to Sharp. Appellant and his family had to leave their "dream house" and move into a smaller home.

To bring in extra income, Sharp opened a thrift store and began cleaning houses. Beginning in May 2013, when ZC was nine years old, Appellant began encouraging Sharp to spend Friday nights at her friend's house out of town so that she could clean. This continued nearly every week until the end of 2013. During this time, Appellant, Sharp, and their daughters lived in May, Texas.

Appellant had a history of violent behavior toward Sharp and the children. On one occasion, approximately four years before they separated, Appellant and Sharp got into a physical altercation that ended with Appellant pinning Sharp to the floor and holding a knife to her throat. ZC and her sister witnessed this incident. Additionally, Sharp testified that Appellant excessively disciplined the children and

2

"thoroughly enjoyed whooping [ZC]." On another occasion, Sharp overheard Appellant telling someone that he would kill her and the children. A few days after this incident, Sharp left the home with the children and applied for a protective order.

On February 24, 2014, Appellant and Sharp attended a hearing on the application for a protective order. The judge lifted the protective order, as it applied to the children, and awarded Appellant supervised visitation with ZC and her sister on the following weekend. That night, Sharp told the girls that they would be going to see Appellant. Upon hearing this news, ZC became upset.

Sharp later found ZC crying in the shower. ZC told Sharp that she "couldn't take the bad touches anymore" and that Appellant had been sexually assaulting her every Friday night when Sharp was with Sharp's friend. According to ZC, Appellant would use his hands and his penis to penetrate her vagina, her anus, and her mouth.

Debbie Coats, a sexual assault nurse examiner (SANE), conducted an examination of ZC. Coats noted a full thickness notch at the one o'clock position of ZC's hymen. She further noted a scar at the seven o'clock position of ZC's posterior fourchette or perineum area. Coats opined that these injuries were consistent with the sexual assault reported by ZC. Appellant offered the testimony of Sonja Eddelman, a SANE nurse from Corpus Christi. Eddelman disagreed that the notch found at the one o'clock position was indicative of trauma and opined that it was most likely congenital.

Coats also examined ZC's anus. In order to check for anal injuries, Coats applied pressure to both sides of the buttocks to allow the muscles to relax. Coats testified that, generally, it takes a child's anus between fifteen and forty-five seconds to relax. However, ZC's anus relaxed in only five seconds. Coats opined that this was consistent with chronic anal penetration. Eddelman agreed that rapid anal dilatation could indicate anal penetration, but she opined that Coats's report did not provide a sufficient amount of detail related to ZC's anal exam.

3

*Analysis*

In his first issue, Appellant contends that the trial court erred in admitting Sharp's testimony describing the incident where Appellant allegedly held a knife to Sharp's throat. Appellant first contends that Sharp's testimony was irrelevant. We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). Under Rule 402 of the Texas Rules of Evidence, "[i]rrelevant evidence is not admissible." TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401.

The State contends that Sharp's testimony was relevant to rebut Appellant's defensive theories. We agree. At trial, Appellant's defensive theory was that Sharp coached ZC to make a false allegation of sexual abuse. Appellant's trial counsel described Sharp's motivation to falsely accuse Appellant during his opening statement: "[Sharp] resented the fact that . . . [Appellant] never went back to work . . . . So she starts trying to figure out a way of how she is going to leave [Appellant] and keep the girls, considering the fact [that] he basically had been raising them for the past year." Evidence that Appellant was physically abusive toward Sharp during their marriage is relevant to rebut the defensive theory that Sharp was motivated by financial gain to leave the marriage and falsely accuse Appellant of sexually abusing their daughter.

Appellant contends that the four-year gap in time between the alleged incident with the knife and the alleged sexual abuse makes the latter irrelevant because it "played [no] role in [Sharp's] decision to separate [from Appellant]." We disagree. Sharp testified that this incident, and others like it, happened after Appellant had

4

been drinking. Similarly, ZC testified that Appellant would sexually assault her after drinking heavily. Sharp testified that, although Appellant had stopped drinking for some time, Appellant had begun drinking again immediately prior to their separation, which placed an additional strain on the marriage. Therefore, the trial court could have reasonably concluded that this incident was relevant to paint a full picture of the family dynamic and to place Appellant's alleged threat to kill Sharp and the children a few days before the separation into context.

Appellant next contends that the unfairly prejudicial nature of Sharp's testimony outweighed its probative value. Under Rule 403, relevant evidence may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002); *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991). Evidence is unfairly prejudicial when it has an undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd). When we review a trial court's determination under Rule 403, we reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 392). An analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

The trial court conducted a Rule 403 balancing test. The trial court found that the evidence was unlikely either to lead to a confusion of the issues or to be too time-consuming and held that the probative value of the evidence outweighed its prejudicial nature. We agree. Sharp's testimony regarding this incident was short, accounting for no more than five pages out of the four volumes of trial testimony. Further, Appellant's defensive theories strengthened the need for this evidence. Appellant's defensive theories were that Sharp made up the allegations against Appellant and coached ZC, who was easily manipulated, into making a false outcry. We, therefore, conclude that the trial court did not clearly abuse its discretion when it allowed the jury to hear Sharp's account of this incident. We overrule Appellant's first issue.

In his second issue, Appellant contends that the trial court erred in admitting Sharp's testimony that Appellant used excessive corporal punishment on ZC and her sister. Appellant first argues that the trial court erred in holding that excessive corporal punishment is not an extraneous offense. However, Appellant's objection at trial was limited to the admissibility of this evidence under Rules 401, 402, and 403. Therefore, we will limit our analysis to those rules. *See* TEX. R. APP. P. 33.1(a); *Berry v. State*, 233 S.W.3d 847, 857 (Tex. Crim. App. 2007) (to preserve a Rule 404(b) complaint on appeal, Appellant must make a timely objection at trial).

Appellant asserts that evidence that Appellant excessively disciplined his children was irrelevant. For the same reasons given in our discussion of Appellant's first issue, we find that this evidence was relevant to rebut the defensive theory that Sharp was motivated by financial reasons to make up the allegations against Appellant and coach ZC to lie. Further, this evidence is relevant to explain ZC's state of mind and the relationship between ZC and Appellant. *See McCulloch v. State*, 39 S.W.3d 678, 680–81 (Tex. App.—Beaumont 2001, pet. ref'd) (discussing

the relevancy of extraneous acts in the context of Article 38.37 of the Texas Code of Criminal Procedure).

Appellant further asserts that the trial court failed to conduct a balancing test as required by Rule 403. "There is no requirement that the trial court place on the record that it has conducted and completed the balancing test in its own mind." *Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd). Since the trial court overruled Appellant's Rule 403 objection, we will presume that it performed the necessary balancing test. *See Hung Phuoc Le v. State*, 479 S.W.3d 462, 469 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

Appellant contends that admitting this evidence might have led the jury to believe that convicting Appellant was necessary in order to protect his children from his excessive discipline. However, the trial court instructed the jury that this evidence may only be considered in rebutting a defensive theory. We will presume that the jury followed the trial court's instructions and considered this evidence only for the purpose of rebutting Appellant's defensive theories. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). We cannot conclude that the trial court clearly abused its discretion in overruling Appellant's Rule 403 objection. We overrule Appellant's second issue.

In his third issue, Appellant contends that the trial court erred in admitting expert testimony regarding rapid anal dilatation because it was unreliable. "A trial judge's ruling on the admissibility of expert testimony is reviewed under an abuse-of-discretion standard and will not be disturbed if it is within the zone of reasonable disagreement." *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (citing *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009)). "Absent a clear abuse of that discretion," we will not disturb the trial court's decision to admit or exclude testimony. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). We review the trial court's ruling in light of the evidence before the court at the time of

the ruling. *Rodgers v. State*, 205 S.W.3d 525, 528–29 (Tex. Crim. App. 2006) (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)).

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX. R. EVID. 702; *see Wolfe*, 509 S.W.3d at 335. For expert testimony to be admissible, the proponent of the expert scientific evidence must demonstrate by clear and convincing evidence that the testimony is "sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). "In other words, the proponent must prove two prongs: (1) the testimony is based on a reliable scientific foundation, and (2) it is relevant to the issues in the case." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Here, we limit our analysis to the prong addressing reliability because Appellant has not challenged the prong addressing the relevancy of the testimony to the issues in the case. It is a trial court's responsibility under Rule 702 to determine whether proffered scientific evidence is sufficiently reliable. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000).

Evidence derived from a scientific theory must satisfy three criteria to be considered reliable: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must be properly applied. *Id.* (citing *Kelly*, 824 S.W.2d at 573). The proponent of the evidence has the burden to show, by clear and convincing evidence, that the evidence is reliable. *Id.* In *Kelly*, the Court of Criminal Appeals suggested "a nonexclusive list of factors that might influence a finding of reliability." *Wolfe*, 509 S.W.3d at 336. These factors include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid in the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence

8

of literature supporting or rejecting the underlying scientific theory or technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573. An appellate court applies the *Kelly* factors to the evidence presented in the case. *See Wolfe*, 509 S.W.3d at 336.

Coats first testified outside the presence of the jury. The parties stipulated at the outset of her testimony to Coats's qualifications to testify as an expert in the field of sexual assault examinations. In this regard, "[q]ualification is distinct from reliability," and each are evaluated independently. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). We note, however, that Coats testified that she had been a SANE nurse for about twenty-two years and that she was certified as such by the Texas Attorney General's office. In her career, she had performed approximately 400 adult SANE exams and approximately 600 pediatric SANE exams.

Coats begins each exam by collecting a history from the patient. Next, she performs a head-to-toe assessment of the patient. Finally, she performs a detailed genital exam and collects any forensic evidence found on the patient. As part of the genital exam, Coats conducts a detailed examination of the patient's anus. She applies pressure to the buttocks in order to relax the muscles and allow her to examine the anus for injuries. Coats then notes how quickly the anus dilates and whether or not there is stool in the vault, which could cause rapid dilatation.

Coats examined ZC's anus as a part of the SANE exam. Coats testified that, typically, the anus will begin to dilate within between fifteen and thirty seconds and will be fully dilated within one minute. She also testified that this examination could be difficult to perform on a younger child because of the time usually required to

cause the anus to dilate. However, Coats did not note any difficulty performing this examination on ZC.

Coats testified that ZC's anus dilated very rapidly, within five seconds. Coats also noted that there was no stool present in the vault of ZC. Coats testified that, in the absence of stool present in the vault, this was an unusual finding in a child and was consistent with a reported history of anal penetration. Coats also testified about other potential causes of rapid anal dilatation, including sedation, chronic constipation, or neurological deficits. However, ZC did not report a history of any of these conditions, unlike her report of anal penetration.

Coats initially testified that her opinion of a finding consistent with anal penetration was not based on any literature but, rather, on her training as a SANE nurse. Specifically, Coats attended the annual Crimes Against Children Conference in Dallas, where physicians discussed rapid anal dilatation. Although she remembered doing "some reading" on rapid anal dilatation, she could not remember any specific articles or journals addressing the subject. Coats was initially unable to provide a rate of error in either the application of this technique or its usefulness as an indicator of sexual abuse. She testified that there was "some controversy" surrounding the technique and that other things, such as the presence of stool in the vault or the patient's position during the exam, could affect the results. Nevertheless, Coats testified that rapid anal dilatation is accepted in the scientific community as a valid symptom of chronic anal penetration. Additionally, Coats testified that her opinion is one recognized by the scientific community that deals with investigating child sexual abuse. Specifically, she agreed with the following excerpt read by the prosecutor from a book entitled "Investigation and Prosecution of Child Sexual Assault," which was written by Teresa M. Buess and Michael E. Trent:

> Immediate dilatation of the anus with no stool visible or palpable in the
> rectal vault when the child is examined in the knee-chest position and

10

where there is no history of chronic constipation, neurological deficits, or sedation are considered definite evidence of blunt force penetrating trauma to the anus.

Appellant responded to Coats's initial testimony regarding rapid anal dilatation by arguing that it was inadmissible under *Escamilla v. State*, 334 S.W.3d 263 (Tex. App.—San Antonio 2010 pet. ref'd). The trial court initially took the matter under advisement. Later that day, Coats again testified outside the presence of the jury. On this subsequent occasion, she testified that an article written by "a man by the name of Hobbs" described a study on anal dilatation. Coats testified that this study concluded that 36% of known sexually abused children exhibited rapid anal dilatation, compared to only 4% of the children in the control group.[1] The trial court subsequently overruled Appellant's objection. Coats then repeated her testimony for the jury.

Eddelman, Appellant's expert witness, was also a SANE nurse. She testified that she had performed approximately 2,000 adult SANE exams and 6,500 pediatric SANE exams. Eddelman reviewed Coats's report that summarized Coats's SANE exam of ZC. Eddelman agreed that a SANE exam should include an examination of the patient's anus. She explained that, if the patient's anus dilated to two centimeters in less than thirty seconds, she would make a note of that finding. Further, she would note whether only the "external" sphincter dilated or whether both the "external" and "internal" sphincters dilated. Coats's report did not contain these details. Eddelman further testified that there is some controversy surrounding this technique because "the anus has not been studied as much as other parts of the body have." Nevertheless, Eddelman testified that rapid anal dilatation could be consistent with sexual abuse.

---

[1]The article by Hobbs was not offered into evidence. Accordingly, its contents are not a part of our analysis other than Coats's description of the article. *See Rodgers*, 205 S.W.3d at 528–29.

On appeal, Appellant again relies on *Escamilla* to support his contention that evidence of rapid anal dilatation is inadmissible. In *Escamilla*, the defendant was convicted of sexually assaulting his two-year-old daughter. *Escamilla*, 334 S.W.3d at 265 (majority opinion). America Garza, a SANE nurse, testified that the rapid dilatation of the victim's anus was consistent with sexual abuse. *Id.* at 267. The San Antonio Court of Appeals analyzed the reliability of Garza's testimony using the *Kelly* factors. *Id.* at 267–70. Garza testified that she had conducted approximately 100 SANE exams. *Id.* at 269. In conducting the SANE exam of the victim in that case, Garza used a procedure that is identical to the one used by Coats. *See id.* at 271 (Hilbig, J., dissenting and concurring). Garza testified that a "normal" anus takes at least one minute to dilate but that the victim's anus dilated in only seven seconds. *Id.* at 269 (majority opinion). Garza opined that this was consistent with sexual abuse. *Id.*

Much like Coats, Garza could not remember any literature or specific scientific studies related to rapid anal dilatation, relying on her training and experience to form her opinion. *Id.* She briefly mentioned Dr. Nancy Kellogg and Dr. John McCann but "could only reference a magazine article possibly written in 2008." *Id.* Finally, Garza testified that the technique was accepted in the medical community. *Id.*

The majority concluded that the State had not met its burden to establish that Garza's testimony was reliable because (1) Garza could not elaborate on the extent to which the technique was reliable in the scientific community, (2) she could make only vague references to supporting literature, and (3) she did not appear to understand the term "potential rate of error." *Id.* However, due to other evidence pointing toward the defendant's guilt, the court affirmed his conviction. *Id.* at 269–70.

Justice Hilbig dissented and concurred, agreeing with the majority that the conviction should be affirmed but believing that Garza's testimony was properly admitted. *Id.* at 270 (Hilbig, J., dissenting and concurring). Justice Hilbig noted that, although Garza could not identify either specific literature or a potential rate of error for the technique, these are only two of seven factors that can be considered under *Kelly*. *Id.* at 274. Justice Hilbig applied the "sliding scale" discussed in *Rodgers*. *Id.* at 275 (citing *Rodgers*, 205 S.W.3d at 528). Under *Rodgers*, an appellate court is to evaluate whether a trial court abused its discretion in determining that a witness is qualified using three criteria: (1) the complexity of the area of expertise; (2) whether or not the expert's opinion was conclusive; and (3) whether or not the expert's testimony is dispositive of the disputed issues. *Rodgers*, 205 S.W.3d at 528. Justice Hilbig believed that Garza's testimony was similar to the expert opinion in *Rodgers*, and he would have held that the trial court did not abuse its discretion in allowing it. *Escamilla*, 334 S.W.3d at 275.

In this case, the trial court adopted a similar line of reasoning as that employed by Justice Hilbig by stating that "not every one of the various litany of *Kelly* factors have to be established, but there is a sliding scale that is utilized as the Court of Criminal Appeals has applied in matters such as this." The trial court found that Coats was qualified as an expert, that the subject matter was not complex like DNA evidence, that Coats's opinion was not conclusive that sexual abuse had occurred as alleged but rather her findings were consistent with sexual abuse, and that it was not "junk science" because the methodology had been accepted. *See Wolfe*, 509 S.W.3d at 336 (noting that the trial court's gatekeeper function is to weed out junk science from evidence that has its basis in sound scientific methodology).

Relying upon *Escamilla*, Appellant contends on appeal that, because (1) Garza was able to provide more information on rapid anal dilatation in *Escamilla* than Coats was able to provide in this case and (2) Garza's testimony did not satisfy

13

the State's burden of proving reliability in *Escamilla*, it follows that Coats's testimony could not have satisfied the State's burden to prove reliability in this case. We disagree. In this regard, the applicable inquiry is whether the trial court abused its discretion in admitting Coats's expert opinion based upon the evidence presented to the trial court in light of the nonexclusive *Kelly* factors. *Wolfe*, 509 S.W.3d at 336.

It is true that, in some respects, Garza was able to provide some information about the technique that Coats could not provide. For example, Garza was able to name two doctors who had studied the technique, whereas Coats could only reference a study by "a man by the name of Hobbs." *See Escamilla*, 334 S.W.3d at 269. However, this approach relies too heavily on attempting to meet all seven of the *Kelly* factors. "The reliability inquiry is . . . a flexible one." *Vela*, 209 S.W.3d at 134; *see Wolfe*, 509 S.W.3d at 336 (explaining that the *Kelly* factors are a nonexclusive list of factors to consider).

Coats had more experience than Garza. Garza had conducted approximately 100 SANE exams at the time of her testimony in *Escamilla*. *Escamilla*, 334 S.W.3d at 269. Conversely, Coats had performed approximately 1,000 SANE exams, consisting of 400 adult and 600 pediatric exams. Further, Garza did not understand what a potential rate of error was. *Id.* Coats, in contrast, was able to explain the second time that she testified that 36% of children known to have suffered from sexual abuse displayed rapid anal dilatation, while only 4% of children in the control group displayed this same symptom. She referred to the article by Hobbs in presenting this testimony. She had previously testified that the rate of error was "very low" for this finding.

Although Coats initially was not able to provide a specific reference to an article or medical journal, she later provided a reference to the article by Hobbs. This is some evidence of the third *Kelly* factor—the factor that Appellant primarily

14

relies upon on appeal. Coats testified that other doctors and nurses in the medical community that investigate sexual abuse of children utilize this technique as part of their sexual assault examinations. This is evidence of the first *Kelly* factor because it indicates that the underlying scientific theory and technique are accepted as valid by the relevant scientific community. Additionally, the trial court received evidence concerning Coats's qualifications and experience as a SANE nurse, which are relevant to the second and seventh *Kelly* factors. Furthermore, the trial court also received evidence pertaining to the potential rate of error, which is the fourth *Kelly* factor. Finally, Coats was able to testify with clarity on the subject of rapid anal dilatation, which is related to the sixth *Kelly* factor. The only *Kelly* factor that was not directly addressed before the trial court was the fifth factor pertaining to availability of other experts to test and evaluate the technique. However, this factor was indirectly addressed by the references to the use of the technique by other sexual abuse investigators. In summary, we conclude that the trial court was presented with sufficient evidence to determine that Coats's opinion met the reliability requirement of Rule 702. Accordingly, the trial court did not abuse its discretion by admitting Coats's testimony regarding rapid anal dilatation. We overrule Appellant's third issue.

In his fourth issue, Appellant contends that the errors he has alleged in his previous three issues constitute cumulative error requiring reversal of the trial court's judgment. The Court of Criminal Appeals has long recognized that the cumulative effect of errors at trial may result in harmful error. *Collier v. State*, 528 S.W.3d 544, 548–49 (Tex. App.—Eastland 2016, pet. ref'd) (citing *Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) (Cochran, J., concurring in refusal of pet.)). However, we have held that the trial court did not commit error in any of the issues raised by Appellant. Therefore, the cumulative-error doctrine is not

applicable to this appeal. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). We overrule Appellant's fourth issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

JUSTICE


May 31, 2018

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[2]

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.