**AFFIRMED; Opinion Filed December 12, 2018.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00837-CR

**ANTONIO GARCIA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-15439-U**

# MEMORANDUM OPINION

Before Justices Myers, Evans, and Brown
Opinion by Justice Myers

A jury convicted appellant Antonio Garcia of murder and assessed punishment at twenty-four years' imprisonment. In three issues, appellant argues the trial court abused its discretion in overruling his objection to the testimony of a witness who repeatedly refused to answer the State's questions; the evidence is insufficient to support the conviction; and a police officer was improperly permitted to bolster the testimony of an "unimpeached complainant." We affirm.

### DISCUSSION

### Sufficiency of the Evidence

We begin with appellant's second issue, which challenges the sufficiency of the evidence to support his murder conviction.

In determining whether the evidence is sufficient to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that

evidence and reasonable inferences therefrom, a factfinder could have found the essential elements of the charged offense was proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The factfinder must resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (citing *Jackson*, 443 U.S. at 319). We presume the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also defer to the factfinder's evaluation of the credibility and weight of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). Under the law of parties, "[a] person is criminally responsible for an offense committed by the conduct of another" if the person "solicits, encourages, directs, aids, or attempts to aid" the other person "with intent to promote or assist the commission of the offense." *Id*. § 7.02(a)(2). While physical presence alone is not sufficient to sustain a conviction as a party to an offense, it may be considered as a factor in determining guilt. *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012). Evidence is sufficient to support a conviction under the law of parties if it shows the defendant was physically present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); *Thompson v. State*, No. 05–17–01173–CR, 2018 WL 4611224, at * 2 (Tex. App.—Dallas Sept. 26, 2018, no pet.) (mem. op., not designated for publication); *Pauley v. State*, No. 05–12–01202–CR, 2014 WL 1018327, at *3 (Tex. App.—Dallas Mar. 6, 2014, pet. dism'd) (mem. op., not designated for

publication).  And flight from the crime scene is a circumstance from which an inference of guilt may be drawn.  *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995).

The evidence at trial showed that on the morning of Saturday, August 29, 2015, Maurice Crawford was sitting in his car in the driveway of the home located at the 2000 block of Meadow Lark, Irving, Texas, that he shared with his fiancé, Mary Ducking.  Mary was inside cooking breakfast when she heard her youngest two children yelling that Crawford was outside fighting.  Mary's oldest son, Demorius Ducking, immediately ran outside.  Mary also ran to the front door but before she got there she heard a gunshot.  She opened the door and saw two people, Demorius and appellant's co-defendant, Miguel Martinez.  Demorius was running around the car, trying to get away from Martinez.  Mary yelled at him to get back in the house but Martinez had him trapped.  Martinez pointed a gun at Demorius.  Demorius begged for his life, saying, "Don't kill me," and Mary also pleaded with Martinez not to shoot her son.  She saw Martinez shoot her son, and Demorius dropped to the ground.

Meanwhile, Demorius testified that as soon as he ran outside he saw Crawford laying on the ground.  He then saw Martinez on his left side pointing a gun at him.  Martinez was only three to four feet away.  Demorius could hear another man behind him saying "shoot, shoot, shoot."  He could not see this person but immediately recognized his voice—it was appellant, Antonio Garcia, who Demorius had known through elementary, middle, and high school.  Demorius identified him in court.  Appellant lived in Irving on Spanish Trail, only a few blocks from Demorius's house.  A few seconds after appellant told Martinez to shoot, Martinez shot Demorius in the face.  Appellant and Martinez fled the scene.

Police and emergency services personnel soon arrived.  Demorius told the police that two people were involved in the shooting, one of whom was appellant, and that he heard appellant yell "shoot, shoot, shoot."  Officer Trey Hart of the Irving Police Department testified that Demorius

identified the people who shot him as "Tony Garcia" and "Miguel." Irving police officer Andrew Padrutt similarly testified that Demorius said "Tony Garcia" and "Miguel" (Demorius did not give a last name) shot him. Demorius also said, according to Padrutt's testimony, that the suspects lived on Spanish Trail, two streets south of Demorius's house on Meadow Lark. Padrutt was familiar with that area and knew Spanish Trail was, in fact, two streets south of the crime scene.

After responding to the crime scene, Irving police detective Don Cawthon discovered there were two suspects and that they had been seen entering a house located at 2000 Spanish Trail. Officers soon set up surveillance and a perimeter around that house and another nearby home, and appellant was eventually taken into custody at the house located at 2000 Spanish Trail. When he surrendered to officers, appellant had a fresh scratch under his right jawline and a light abrasion on his right elbow. Cawthon concluded, based on his training and experience, the wounds indicated appellant had been involved in the struggle with Crawford that Demorius described. Police also showed a photographic lineup to Mary Ducking, who identified Martinez as the shooter.

Dallas police officer Andy Ausen interviewed Demorius in the hospital emergency room. According to Officer Ausen's testimony, Demorius said he was inside his house reading when he heard a "commotion" outside, in the front yard. Demorius knew Crawford was outside, so he ran out of the house and saw that Martinez and appellant were "jumping his step-dad." Demorius could see appellant had Crawford pinned to the ground. Appellant told Martinez, who had a gun, "to shoot." Demorius begged Martinez not to shoot Crawford, telling him, "Don't, don't do it," but Martinez shot him. Martinez then pointed the gun at Demorius, and Demorius pleaded with Martinez to not shoot him, saying, "Don't do it." Martinez shot Demorius in the face. Demorius could not remember anything after that. Ausen also testified that Demorius said he knew the two suspects because he had grown up with them; they went to school together.

–4–

Later that day, after officers had arrested Martinez and appellant, two Irving police detectives, Kevin Burkleo and Don Cawthon, interviewed Demorius at the hospital. They showed Demorius two photographic lineups and he positively identified Martinez and appellant from those lineups. Demorius was unable to sign the photographic lineup admonition forms but he used his hand or finger to show when to move to the next picture and gave a "thumbs up" sign and held up three fingers to indicate he had made a positive identification of appellant from the third photo in the first of the two photographic lineups Demorius was shown. The second lineup was administered in the same fashion, according to Detective Burkleo's testimony.[1]

Regarding the shooting, both detectives testified that Demorius told them he exited the house and saw appellant fighting with Crawford. Demorius said appellant was losing the fight with Crawford, and that he directed Martinez to shoot Crawford, which Martinez did. Martinez shot Demorius after shooting Crawford.

Tammy Stegman, a homeowner who lived at the corner of Meandering Drive and Meadow Lark, testified that she was at home on August 29, 2015, when she saw someone run past her front window, followed by police cars "coming from everywhere." She checked the cameras on her home security system. The video recording she found showed two male individuals—one a heavier-set individual wearing a grey "Old Navy" shirt with red sleeves and dark-colored athletic shorts with white stripes; the other dressed in a long-sleeved black shirt and long black pants— casually walking in front of her house on Meandering Drive and turning left onto Meadow Lark. A few minutes later, those same two individuals could be seen running from the direction they had just walked on Meadow Lark and heading towards Meandering Drive. After discovering this video, Stegman called 911. Detectives Burkleo and Cawthon later viewed the recording, which was admitted into evidence.

---

[1] A video of the identification was admitted for record purposes.

Appellant was wearing a green t-shirt and dark blue basketball shorts when he surrendered to the police. During a search of appellant's residence at 2000 Spanish Trail, officers found a pair of black jeans, a black long-sleeved shirt, and black shorts in the bathroom adjoining appellant's bedroom. Detective Vance Barnes concluded that one of the two suspects seen in the security camera recording wore the black pants and shirt found in appellant's residence.

A subsequent search revealed clothing matching the clothing worn by the second, heavier-set individual in the security camera video, i.e., an "Old Navy" t-shirt and dark-colored athletic shorts with white stripes. Detective Cawthon believed appellant was the one in the security camera video wearing the black clothing, and that Martinez was the heavier-set individual wearing shorts and the "Old Navy" t-shirt. Cawthon also testified that the black clothing found in appellant's residence matched the clothing he was seen wearing in the security camera video, and that it is common for someone who commits a robbery to wear extra clothing that could be quickly discarded after the crime has been committed.

The physical evidence included two fired .40 caliber Smith and Wesson shell casings, one found in front of a vehicle parked in the driveway of Demorius's residence, and the other found in the front yard. Officers also retrieved a silver and black Smith and Wesson handgun and an associated magazine from appellant's residence (at 2000 Spanish Trail) that had been found by appellant's sister. A firearms and tool mark examiner with the Southwestern Institute of Forensic Sciences (SWIFS) concluded the .40 caliber Smith and Wesson handgun was used to fire the two shell casings found at the crime scene. A SWIFS biologist developed a DNA profile from the handgun and the magazine, and concluded appellant "can be a possible contributor" to the DNA profile recovered from the handgun. The SWIFS biologist also concluded appellant could not be excluded as a contributor to the DNA sample from the magazine. Gunshot residue particles were found on both of appellant's hands, which, according to a SWIFS trace examiner, was consistent

with him holding or firing a gun.[2]

The trial court instructed the jury that it could find appellant criminally responsible as a party if the offense was committed by his own conduct, by the conduct of another for which he was criminally responsible, or both. *See* TEX. PENAL CODE ANN. § 7.01. There is ample evidence to support the jury's verdict. The evidence shows appellant was not only physically present during Crawford's murder but that he aided or encouraged Martinez to shoot Crawford. The security camera recording shows appellant and Martinez walking together to the crime scene and, minutes later, running away in a desperate and frantic manner—evidence of flight that is probative of appellant's guilt. Clothing matching the clothing worn by appellant and Martinez in the security camera video was found at appellant's residence, along with a .40 caliber Smith and Wesson handgun that, according to testimony, was used to fire two shell casings retrieved from the crime scene. Appellant could not be excluded as a contributor of DNA found on the handgun, and gunshot residue particles were found on both of appellant's hands, which was consistent with appellant handling a gun or being in close proximity to one.

The jury heard the testimony of the witnesses and saw the security camera recording, and resolved any conflicting inferences. We defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 326. Reviewing all the evidence in the light most favorable to the verdict, we conclude the jury could have rationally found beyond a reasonable doubt that appellant was guilty of murder. We overrule appellant's second issue.

**Martinez's Refusal to Testify**

In his first issue, appellant argues the trial court abused its discretion by overruling appellant's objections to the State's questioning of appellant's co-defendant, Miguel Martinez,

---

[2] The examiner noted that such a finding could result from firing a gun, being in proximity to a fired gun, picking up something that had gunshot residue on it, or being exposed to an environmental source like fireworks.

who repeatedly refused to answer the State's questions before the jury. Appellant claims it had no probative value and prejudiced him under rule 403 of the rules of evidence.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion if its decision falls outside the zone of reasonable disagreement. *Id*. at 83.

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Hernandez v. State*, 390 S.W.3d 310, 323 (Tex. Crim. App. 2012). Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *See Henley*, 493 S.W.3d at 102; *Hernandez*, 390 S.W.3d at 323. A proper rule 403 analysis includes, but is not limited to, four factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *See Henley*, 493 S.W.3d at 102. We may also consider whether there is any tendency of the evidence to confuse or distract the jury from the main issues as well as any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of that evidence. *See id.* (discussing *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006)).

All evidence against a defendant is, by its nature, designed to be prejudicial. *See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). "Rule 403 does not exclude all prejudicial evidence, only evidence that is unfairly prejudicial." *Henley*, 493 S.W.3d at 102 (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). "Unfair prejudice" refers only to relevant evidence's tendency to tempt the jury into reaching a decision on grounds apart from the proof presented in support of the claim. *See Henley*, 493 S.W.3d at 102; *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003). If the evidence relates directly to elements of a particular claim,

it may be prejudicial, but not unfairly so. *See Henley*, 493 S.W.3d at 102; *Manning*, 114 S.W.3d at 928. Furthermore, absent an explicit refusal to conduct the rule 403 balancing test, we presume the trial court conducted the test when it overruled a rule 403 objection. *See Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

In the presence of the jury, the State called Martinez to the witness stand. When the trial court asked him to take an oath, Martinez asked the court if he could "plead the Fifth." The jury was quickly excused and a hearing was held, during which the trial court took judicial notice of Martinez's judgments of conviction for aggravated assault (serious bodily injury) and murder, as well as his plea agreements with the State. Those documents were admitted for record purposes. Martinez testified out of the jury's presence that he was incarcerated because he had pleaded guilty in separate cases to the murder of Crawford and the aggravated assault of Demorius. But when the prosecutor asked Martinez if he knew appellant, Martinez's attorney stated, "Your Honor, at this point he would invoke his constitutional rights not to testify any further." The State argued Martinez had no right to invoke the Fifth Amendment privilege because he pleaded guilty to the offenses, waived his right to appeal, and there was no appeal pending in either case. The trial court agreed and ordered Martinez to answer the State's questions because he could not lawfully refuse to testify. Martinez's counsel advised him the trial court could hold him in contempt of court for refusing to answer questions the court had ordered him to answer. Martinez's counsel further advised that if Martinez wanted to answer the prosecutor's questions, he believed the State was prepared to offer him "immunity as to any further offense that may lead to criminal prosecution." The State then asked Martinez the questions it intended to ask in the presence of the jury. Martinez declined to answer the State's questions despite being repeatedly admonished that he could be held in contempt of court. Following the State's proffer, the trial court ruled that it would allow the State to ask Martinez "the questions they feel they need to ask," and that "as long as those are not

protected by the Fifth Amendment, I'm going to do the same thing that we just did." Defense counsel informed the trial court that he would have to object after each of the State's questions, and the trial court told him to "make the objections you feel you need to make."

The State re-called Martinez to the stand in front of the jury. After taking an oath and stating his name, he testified that he was currently incarcerated but he refused to answer any of the State's questions regarding the instant offense or appellant. Appellant was repeatedly admonished by the court that he could be held in contempt for refusing to answer. Defense counsel objected based on rules 403 and 404(b) and lodged other objections before being granted a running objection. The record of Martinez's appearance before the jury reads in part as follows:

> Q. [STATE:] At any point did you ever live on Spanish Trail in Irving, Texas?
>
> A. [MARTINEZ:] I refuse to answer the question.
>
> THE COURT: Mr. Martinez, you are being ordered by the Court to answer that question. Failure to do so could result in you being held in contempt by this Court. Are you failing—or refusing to answer that question?
>
> THE WITNESS: Yes.
>
> THE COURT: Ask your next question, [State].
>
> Q. [STATE:] Are you currently incarcerated?
>
> A. Yes.
>
> Q. Are you currently incarcerated for the murder of Maurice Crawford?
>
> A. I refuse to answer that question.
>
> THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?
>
> THE WITNESS: Yes, I refuse to answer the question.
>
> [DEFENSE COUNSEL:] Your Honor, I'm going to object to any further questions of this nature because under 404(b) and 403 and the probative value of any further questions by the State outweigh any—prejudicial value outweighs any probative evidence.
>
> THE COURT: Your objection is overruled. Proceed, [State]

Q. [STATE:] Are you currently incarcerated for aggravated assault against Demorius Ducking?

A. I refuse to answer the question.

THE COURT: Mr. Martinez, you are being ordered by this Court to answer the question, and refusal to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL:] Again, I object to any further line of questioning on this matter. Same objection.

THE COURT: Your objection is overruled.

[DEFENSE COUNSEL:] And I'm sorry, members of the jury, but I will continue to object.

THE COURT: All right. Proceed, [State].

Q. [STATE:] Mr. Martinez, are you currently housed at the Alfred Hughes Unit?

A. I refuse to answer the question.

THE COURT: Mr. Martinez, you are being ordered by this Court to answer the question, and failure to do so could result in you being held in contempt by the Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse.

[DEFENSE COUNSEL:] Objection.

THE COURT: Your objection is overruled. [State], proceed.

Q. [STATE:] Mr. Martinez, were you bench warranted back to Dallas County from the Alfred Hughes Unit?

A. Yes.

Q. Mr. Martinez, did I meet with you at the Alfred Hughes Unit in Gatesville, Texas, a few weeks ago?

A. Yes.

Q. Did I inform you at that time that I would be bench warranting you back to Texas for the trial of Antonio Garcia?

A. Yes.

–11–

Q. Did I inform you at that time in Gatesville that I could not offer you any kind of deal?

A. Yes.

Q. Did I meet with you when you were bench warranted back at Lew Sterrett [jail]?

A. Yes.

Q. Did I inform you at that time that I could not offer you any deal?

A. Yes.

Q. You have never been offered any deals, correct?

A. Correct. Correct.

Q. And I informed you when I met with you at Lew Sterrett that I would be calling you to the stand this morning for the trial of Antonio Garcia, correct?

A. Yes.

Q. Mr. Martinez, do you know Antonio Garcia?

A. I refuse to answer the question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt in this Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse.

THE COURT: [State]. Proceed, [State].

Q. [STATE:] Did you—in 2015, did you go to high school at Irving Nimitz with Antonio Garcia?

A. I refuse to answer your question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

[DEFENSE COUNSEL:] Objection.

THE COURT: Your objection is overruled.

[DEFENSE COUNSEL:] May I have a running objection?

THE COURT: You may. Proceed, [State].

Q. [STATE:] On August 29, 2015, were you hanging out that morning with Antonio Garcia?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer.

Q. [STATE:] On August 29, 2015, did you and Antonio Garcia discuss robbing people for money?

A. I refuse to answer this question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, as you were walking down Meandering Way, did you observe that Antonio Garcia had a handgun?

A. I refuse to answer your question.

THE COURT: You're being ordered by this Court, Mr. Martinez, to answer the question, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer the question.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, did Antonio Garcia run up on an individual at 2032 Meadow Lark with a handgun?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

THE COURT: Proceed.

Q. [STATE:] On August 29, 2015, did the person occupying the car in front of 2032 Meadow Lark tackle Antonio Garcia causing him to lose control of the handgun?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer the question.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, did Antonio Garcia toss you the handgun as he—after he was tackled by the person who had occupied that vehicle in front of 2032 Meadow Lark?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, after Antonio Garcia tossed you the handgun, did you pick up the handgun?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez. Are you refusing to answer the question?

THE WITNESS: I refuse to answer the question.

THE COURT: Proceed.

Q. [STATE:] On August 29, 2015, in front of 2032 Meadow Lark, was Antonio Garcia involved in a struggle with someone who had occupied the car in front of 2032 Meadow Lark?

A. I refuse to answer that question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer the question.

–14–

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, did you observe that Demorius Ducking came from— outside of 2032 Meadow Lark?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes I refuse to answer the question.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, did you shoot Demorius Ducking after he came out of the house?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

Q. [STATE:] On August 29, 2015, in front of 2032 Meadow Lark, did you shoot the person Antonio Garcia was in a struggle with?

A. I refuse to answer that question.

THE COURT: Mr. Martinez, you're being ordered by this Court to answer the question. And failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse.

THE COURT: Proceed, [State].

Q. [STATE:] On August 29, 2015, after those two people were shot in front of 2032 Meadow Lark, did you and Antonio Garcia run back to Antonio Garcia's house at 2000 Spanish Trail?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse to answer the question.

–15–

THE COURT: Proceed.

Q. [STATE:] On August 29, 2015, as you are running back to 2000 Spanish Trail, did you hand the handgun back to Antonio Garcia?

A. I refuse to answer that question.

THE COURT: You're being ordered by the Court to answer the question, Mr. Martinez. Failure to do so can result in you being held in contempt by this Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse to answer the question.

THE COURT: Proceed.

Q. [STATE:] On August 29, 2015, were you arrested at 2000 Spanish Trail?

A. I refuse to answer the question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez. Failure to do so could result in you being held in contempt of this Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse to answer the question.

THE COURT: Proceed.

Q. [STATE:] On August 29, 2015, were you transported to Irving Police Department to an interview room?

A. I refuse to answer the question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer this question?

THE WITNESS: I refuse to answer this question.

Q. [STATE:] On August 29, 2015, were you interviewed by Detective—Irving Police Department detective Don Cawthon?

A. I refuse to answer this question.

THE COURT: You're being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer this question?

A. Yes, I refuse to answer the question.

Q. [STATE:] On August 29—sorry, on August 31st, 2015, were you interviewed for a second time by Irving Police Department detective Don Cawthon?

THE WITNESS: I refuse to answer the question.

THE COURT: You're being ordered by this Court, Mr. Martinez, to answer the question, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer this question?

A. Yes, I refuse.

Q. [STATE:] Prior—

THE COURT: Can I see the attorneys?

(Bench conference held off the record.)

THE COURT: Proceed, [State].

Q. [STATE:] Mr. Martinez, has anybody attempted to encourage you not to testify about the events of August 29, 2015, prior to today?

A. I refuse to answer the question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse.

Q. [STATE:] Prior to today, Mr. Martinez, has anybody from Antonio Garcia's family encouraged you not to answer questions this morning about the events of August 29, 2015?

A. I refuse to answer the question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer this question?

THE WITNESS: Yes, I refuse to answer the question.

THE COURT: Proceed.

Q. [STATE:] Mr. Martinez, prior to today has Antonio Garcia encouraged you not to answer questions about the events of August 29, 2015, on the stand today?

A. I refuse to answer the question.

THE COURT: You are being ordered by this Court to answer the question, Mr. Martinez, and failure to do so could result in you being held in contempt by this Court. Are you refusing to answer the question?

THE WITNESS: Yes, I refuse to answer the question.

[STATE:] State has no further questions.

Regarding the rule 403 factors, appellant argues that Martinez's refusal to answer questions before the jury had no probative value and that the mere asking of questions that would have linked appellant with Martinez was prejudicial. But the trial court could have concluded Martinez's testimony was highly relevant and probative. Appellant was charged under the law of parties, and the evidence showed appellant and Martinez were arrested together at a house to which witnesses saw the two suspects flee. Martinez's presence on the witness stand served to make more probative the fact that he shot Crawford and that appellant encouraged him to do it. Accordingly, the probative value of Martinez's testimony and the State's need for it both weighed in favor of its admission. As for the potential to impress the jury in some irrational but indelible way, Martinez offered no substantive testimony apart from confirming he was presently incarcerated; that he met with the prosecutor prior to being called to testify; that he was told he would be bench warranted back to Dallas; and that the prosecutor informed him that he could not offer him any kind of a deal in return for his testimony. Given the other evidence presented in this case, the jurors' hostilities, emotions, or sympathies are unlikely to have been affected by merely seeing Martinez take the stand and refusing to answer most of the State's questions. And appellant does not direct our attention to any particular facts about Martinez's appearance on the witness stand that would have shown it to be uniquely or unfairly prejudicial. It is also worth noting that the trial court ruled Martinez had no valid Fifth Amendment privilege—a finding that is not challenged. Courts generally hold that when a witness does not have a valid basis for refusing to testify, such as when that person has been granted immunity, it is not error to call him to the stand and allow the jury to see him invoke the Fifth Amendment. *See Coffey v. State*, 796 S.W.2d 175, 179 (Tex. Crim. App. 1990); *Perez v. State*, 41 S.W.3d 712, 718–19 (Tex. App.—Corpus Christi 2001, no pet.); *Gonzalez v. State*, No. 05–05–01542–CR, 2007 WL 4056, at *1 (Tex. App.—Dallas Jan. 2, 2007, pet. ref'd)

(mem. op., not designated for publication). Likewise, there was a low probability of confusion or distraction of the jury from the main issues in the case. The jurors heard witnesses testify about "Miguel," appellant's co-defendant; that Miguel shot Crawford; and that appellant encouraged him to shoot Crawford. The trial court could have determined Martinez's appearance on the witness stand served to clarify the issues in the case and the applicable law for the jurors. Moreover, the State did not spend an inordinate amount of time questioning Martinez. His appearance before the jury consisted of approximately fifteen pages of reporter's record in what was a three-day trial. Nor could Martinez's appearance on the stand be considered a needless or cumulative presentation of evidence, particularly given the other factors that weigh in the State's favor. Based on this record, we conclude the trial court did not abuse its discretion in overruling appellant's rule 403 objection.

Furthermore, were we to conclude the trial court erred, appellant was not harmed. Review of the record shows the evidence of appellant's guilt as a party to Crawford's murder is overwhelming. Thus, even if we assume the trial court erred in allowing the State to question Martinez, that error was harmless under rule 44.2(b) because, given the considerable evidence of appellant's guilt, it did not have a substantial and injurious effect or influence on the jury's verdict and did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We overrule appellant's first issue.[3]

## Bolstering Objection

In his third issue, appellant contends that a Dallas police officer was improperly permitted

---

[3] Defense counsel also objected at trial based on rule 404(b), but appellant offers no argument in support of any complaint involving extraneous conduct under rule 404(b). Thus, to the extent appellant is attempting to raise a rule 404(b) issue in this appeal, it is inadequately briefed and presents nothing for our review. *See* TEX. R. APP. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (court is under no obligation to make an appellant's arguments for him) (citing *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008)).

to bolster the testimony of an "unimpeached complainant," i.e., Demorius Ducking.

During the trial, defense counsel objected to testimony from Officer Ausen, who interviewed Demorius at the hospital, on grounds that the officer improperly bolstered Demorius's version of events. The relevant portion of the record reads as follows:

Q. [STATE:] And so you asked him what happened; is that correct?

A. [AUSEN:] Yes.

Q. And just generally, did he give you a [sic] explanation as to what happened?

A. He recounted what happened. Not—it wasn't so much an explanation.

Q. Okay. Did he give you a description about exactly what happened and who did what?

A. Yes.

Q. Did he give you names of who did what?

A. Yes.

Q. Did he give you order of events of who did what?

A. Yes.

Q. And while he was there, what did he tell you happened?

[DEFENSE COUNSEL]: Objection; bolstering.

THE COURT: Response of the State?

[STATE]: One, Judge, we don't think that's a proper objection and, two, I believe counsel has already stated that he believed that—that the witness, Mr. Ducking, had given a different story. So I'm asking for the story he gave this officer.

THE COURT: Overruled.

Bolstering is defined as "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantially contributing 'to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'" *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993) (quoting former version of Texas Rule of Evidence 401).

The Court of Criminal Appeals has recognized that "while the term 'bolstering' is slowly dying as an objection on its face, it has not yet expired, despite the fact that the term itself failed to survive the adoption of the Rules." *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009). The Court did not identify the extent to which the objection survives, though it did indicate that "[a] fundamental problem with an objection to 'bolstering' is its inherent ambiguity." *Id.*

With this in mind, the trial court could have concluded that the objected-to testimony from Officer Ausen was not bolstering because it corroborated Demetrius Ducking's testimony. Evidence that corroborates the story of another witness, "in the sense that it has an incrementally *further* tendency to establish a fact of consequence, should not be considered 'bolstering.'" *Cohn*, 849 S.W.2d at 820. Thus, the trial court did not abuse its discretion in overruling appellant's bolstering objection.

Appellant also complains that the trial court permitted Officer Ausen to provide testimony based on hearsay, but there was no hearsay objection to Ausen's testimony—the objection was "bolstering," not hearsay. And it is well-known that an appellant fails to preserve error when the contention urged on appeal varies from the specific complaint made in the trial court. *See* TEX. R. APP. P. 33.1(a); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009); *Crouse v. State*, 441 S.W.3d 508, 516 (Tex. App.—Dallas 2014, no pet.). Therefore, to the extent appellant raises a hearsay complaint regarding Ausen's testimony, it was not preserved for appellate review. We overrule appellant's third issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b)
170837F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ANTONIO GARCIA, Appellant

No. 05-17-00837-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-15439-U.
Opinion delivered by Justice Myers.
Justices Evans and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 12th day of December, 2018.